**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHERION PRICE o/b/o her minor son, J.C.** | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:24-cv-1387** |
| | § | |
| **IESAH WHITE, ANTONIO BRITTON, GUADALUPE FRIAS, and MARK SHARROCK,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, CHERION PRICE on behalf of her minor son, J.C., complaining of IESAH WHITE, ANTONIO BRITTON, GUADALUPE FRIAS, and MARK SHARROCK, and for causes of action will respectfully show unto the Court as follows:

> "[A] constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).

## SUMMARY

On June 6, 2022, Plaintiff J.C., a sixteen-year-old boy, chaperoned his god sister and younger sister while attending a neighborhood pool with his friend. Security guard Shana Cowen approached J.C. after receiving a report about a male at the pool with a gun. <u>J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go</u>. Deputy Iesah White from the Kaufman County Constable's Office Precinct 2, and Deputy Snow from the Kaufman County Constable's Office responded to the pool after receiving a report from Cowen about a male at a pool with a gun. J.C. calmly told the deputies that he did not have a gun and informed them that his "brother," who was actually a close friend, had a backpack and had previously left the pool. Deputy Antonio Britton, Lieutenant Guadulupe Frias, and Corporal Mark Sharrock also from the Kaufman County Constable Office Precinct 2, arrived at the scene and joined Deputy White in questioning J.C. who was cooperating fully with the investigation. J.C. led the deputies to the backpack left behind by his friend and when requested, gave the deputies permission to search the backpack left behind by J.C.'s friend.

Deputy Britton did not find a gun after searching the backpack. Witnesses at the scene stated that a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival. <u>Despite having information that J.C. had not committed any crime as he did not have a gun, Deputy Frias instructed Deputy White and Deputy Britton to illegally detain J.C.: White and Britton illegally detained J.C. by informing him he was detained and requesting that he place his hands behind his back so they could take him to his residence</u>. J.C. said, "hold up" and turned and took two steps in the direction of his sister who was observing

the entire encounter from a bench on the other side of the pool so he could tell her that he was being detained.

Britton tackled J.C. on the ground. While Deputy Britton held J.C. down as Corporal Mark Sharrock tased J.C. twice and Deputy Guadalupe Frias tased and drive stunned him twice. All of this occurred despite the fact J.C. was not suspected of committing a serious or violent crime, was not attempting to flee, and was not actively resisting arrest at the time he was tased and drive-stunned. Due to the excessive force, J.C. suffered injuries physical injuries including scarring, and bruises from being tased and drive-stunned as well as mental anguish, pain, and suffering. Due to his illegal detention J.C. suffered injuries including deprivation of his liberty. J.C. now files this lawsuit for violation of his right to be free from illegal detention and excessive force under the Fourth Amendment to the United States Constitution.

## I.
## PARTIES

1.    Plaintiff is a resident of Denton County, Texas.

2.    Defendant Iesah White is an individual who at all times relevant to this lawsuit was a Deputy with the Kaufman County Constable's Office Precinct 2 located in Kaufman, Texas, and can be served at her place of employment at the Kaufman County Constable's Office Precinct 2 located at 200 E. Main St, Forney, Texas 75126. Defendant White is being sued in her individual capacity.

3.    Defendant Antonio Britton is an individual who at all times relevant to this lawsuit was a Deputy with the Kaufman County Constable's Office Precinct 2 located in Kaufman, Texas, and can be served at his place of employment at the Kaufman County Constable's Office Precinct 2 located at 200 E. Main St, Forney, Texas 75126. Defendant Britton is being sued in his individual capacity.

4.      Defendant Guadalupe Frias is an individual who at all times relevant to this lawsuit was a Deputy with the Kaufman County Constable's Office Precinct 2 located in Kaufman, Texas, and can be served at his place of employment at the Kaufman County Constable's Office Precinct 2 located at 200 E. Main St, Forney, Texas 75126. Defendant Frias is being sued in his individual capacity.

5.      Defendant Corporal Mark Sharrock is an individual who at all times relevant to this lawsuit was a Corporal with the Kaufman County Constable's Office Precinct 2 located in Kaufman, Texas and can be served at his place of employment at the Kaufman County Constable's Office Precinct 2 located at 200 E. Main St, Forney, Texas 75126. Defendant Sharrock is being sued in his individual capacity.

## II.
## JURISDICTION AND VENUE

6.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

7.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because all of the causes of action accrued in Kaufman County in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

8.      On June 6, 2022, J.C., a sixteen-year-old boy, chaperoned his god sister and younger sister while attending a neighborhood pool with his friend.

9.      Security guard Shana Cowen approached J.C. after receiving a report about a male at the pool with a gun.

10.      J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go.

11.     Deputy Iesah White from the Kaufman County Constable's Office Precinct 2, and Deputy Snow from the Kaufman County Constable's Office responded to the pool after receiving a report from Cowen about a male at a pool with a gun.

12.     Cowen informed Deputy White and Deputy Snow that a tall, brown male that she had no idea if he was underage, eighteen, or nineteen years old put a gun away.

13.     Deputy Snow asked if the male had the gun out since he had put it away.

14.     Cowen stated that the male didn't have the gun out, but he had it in his pants.

15.     Deputy White and Deputy Snow walked up to the pool and signaled for J.C.to step out of the pool.

16.     J.C. immediately complied with the instruction to step out of the pool.

17.     Deputy Snow asked J.C. how old he was.

18.     J.C. answered that he was sixteen years old.

19.     Deputy Snow asked J.C. if he had a firearm they needed to know about.

20.     J.C. respectfully responded, "no sir."

21.     Deputy Snow asked J.C. if he was sure if he did not have a firearm and if he had a backpack where it was located.

22.     Deputy White asked what kind of backpack it was.

23.     J.C. answered that "he [referring to his friend that was previously at the pool] just left so I don't know. He probably took it home. He's gone."

24.     Deputy White asked J.C. if he had a backpack there at the pool.

25.      J.C. shook his head no, and said he was not wearing a backpack.

26.     Deputy White responded, "You ain't be wearing a backpack? All of y'all wear backpacks."

27.    J.C. responded that he doesn't carry a backpack and doesn't need a backpack.

28.    Deputy White asked if the male at the pool earlier was his brother.

29.    J.C. responded that it was his little brother, but he has another brother.[1]

30.    Deputy White responded, "y'all look alike that's why I know that was your brother and y'all both got your twist in your hair."

31.    Deputy Britton and Deputy Sharrock arrived at the scene and walked over to Deputy White and J.C.

32.    The three deputies stood over J.C. who was seated in a chair and continued questioning him.

33.    Deputy White told Britton and Sharrock "yeah, he talked to him then said he'd be right back. He left."

34.    Deputy White told Deputy Britton and Deputy Sharrock that J.C. was the guy but did not have a backpack.

35.    Deputy Britton asked J.C. if anyone had spoken to him about having a gun.

36.    J.C. answered that the pool lady [Ms. Cowen] asked if he had a gun because someone said they saw him with a firearm.

37.    Deputy Britton asked if he had a gun and if he ever had one.

38.    J.C. again stated no.

39.    Deputy Sharrock questioned, "Did you pick up the backpack?

40.    J.C. shook his head no.

---

[1] J.C. is still referring to his friend that left the pool earlier but is using the term "brother" to mean that this was a close friend.

41.    Deputy Sharrock stated, "That's not what I'm being told. I mean there's cameras out here we can do it that way. I rather you just tell me the whole deal man."

42.    J.C. again informed the deputies that his brother had a backpack, but he had already left.[2]

43.    J.C. walked over to the backpack that was left behind by his friend with Deputy White, Deputy Sharrock, and Deputy Britton.

44.    Deputy Britton asked if J.C. cared if they looked through the backpack.

45.    J.C. stated that they could.

46.    Defendant Britton searched the backpack for a gun while Defendant White and Defendant Sharrock observed.

47.    Defendant Britton did not find a gun after searching the backpack left behind by J.C.'s friend.

48.    Deputy Britton asked J.C. how old he was.

49.    J.C. informed Deputy Britton that he was sixteen years old.

50.    Deputy Sharrock went to check the bathroom since witnesses had stated the male that was previously at the pool seen with the gun went into the bathroom.

51.    Deputy Frias arrived at the scene.

52.    Deputy Britton asked J.C. if he had his drivers license or school identification on him while Deputy White asked J.C. his first and last name.

53.    J.C. provided his name and date of birth as requested and informed him he did not have identification with him.

---

[2] J.C. is still referrering to his friend that left the pool earlier but is using the term "brother" to mean that this was a close friend.

54.    Deputy White went to search the bathrooms for the gun.

55.    A female witness came in the bathroom.

56.    Deputy White asked if the female witness if she saw the gun and when she saw it what happened to it.

57.    The female witness stated, "they jumped the fence."

58.    Deputy White walked out back to Deputy Britton and Frias and informed them that the weapon was gone.

59.    Deputy Frias stated, "if there was one."

60.    Deputy White stated, "it was one."

61.    When Deputy Frias asked how she knew this Deputy White informed him that the caller reported, "the brother that left jumped the fence and took off." There was no justification to continue detaining J.C. as the deputies had been informed by witnesses at the scene that a male juvenile who was accompanying J.C. had left the scene with a weapon, the deputies had searched and had not located a gun, and J.C. had not committed any crimes justifying his illegal detention. Below is a screenshot of an incident report acknowledging deputies had this information, but still continued to detain J.C.

Deputies then made contact with Coleman and questioned him concerning the statement made by the security officer. Coleman stated that he and his brother had a backpack, but that there was no weapon in the backpack and that he did not have a gun in his possession or previously. He gave permission for Deputies to check the contents of the backpack which confirmed there was no gun in the bag. Witnesses on scene stated that a male juvenile was accompanying Coleman and left the scene with the weapon prior to Deputy arrival.

62.    Defendants continued detaining J.C. and interrogating J.C., despite the fact that there was nothing justifying his continued illegal detention.

63.    Deputy Frias stated, "let's find out where he lives."

64.    Deputy White asked J.C. for his address.

65.    J.C. responded that he didn't know the name of the street as his family had just moved, but the street was about five streets down from their current location.

66.    Defendant Frias told Defendants Britton and White to take J.C. home, check the brother out, and "He's with you. Cuffs or no cuffs I don't care but he's with you till we find the gun."

67.    J.C. again informed the deputies that there was no gun.

68.    Below is a screen capture of Defendant Frias' narrative in the incident report where he states "Deputy White advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and location prior to our arrival. Due to the information that was gathered and the subject that was being questioned was 16 years of age I directed Deputy White and Britton to take custody of the subject being questioned and that we would be taking home to locate his brother and release the subject to his parents after informing the parent of the nature of the call."

On 6-6-23, I Lt. Frias #4701 at 6:28pm was dispatched to a Man with a Gun call at the Buckingham pool area. Upon arrival several deputies from Kaufman County Sheriff's Dept. and Pct#2 were already on scene investigating the nature of the call. Call notes advised that a tall big black male subject was possibly in possession of a firearm at the location. Upon arrival deputies were conducting an interview with a male matching the description. Deputy White advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and left the location prior to our arrival. Due to that information that was gathered and that the subject that was being questioned was 16 years of age I directed Deputy White and Britton to take custody of the subject being questioned and that we would be taking home to locate his brother and release the subject to his parent after informing the parent of the nature of the call.

69.     Thus, despite having information that J.C. had not committed any crimes <u>as he did not have a gun and was not described by witnesses as being the person with a gun</u>, Defendant Frias instructed Defendants Britton and White to detain J.C.

**<u>Prolonged Detention</u>**

70.     Defendants Britton and White further detained J.C. by informing him he was detained and requesting that he place his hands behind his back.

71.     J.C. spoke calmly with the deputies for approximately fourteen minutes answering all of their questions before he was instructed to place his hands behind his back.

72.     Defendant Britton told J.C. that they were going to take him to his house to find out where he was staying.

73.     Accordingly, Defendants Britton and White further detained J.C.by informing him he was detained and requesting that he place his hands behind his back.

74.     Defendants Britton and White all had the ability to not detain J.C. once they knew he was not a threat, did not commit a crime and was not armed with a weapon since Britton had <u>searched the backpack</u> left behind by J.C.'s friend <u>confirming J.C did not have a weapon and witnesses had stated a male juvenile who was accompanying J.C .had left the scene with a weapon</u>

prior to the deputies and corporal's arrival; however, Defendant Britton and White detained J.C. by informing him he was detained and requesting that he place his hands behind his back.

75.     J.C. said "hold up" in response to the illegal detention and turned and took two steps in the direction of his younger sister who was sitting watching the encounter to tell her that he was being detained and that the deputies would be taking him home.

76.      Almost simultaneously, as J.C. said, "hold up" and took two steps in the direction of his little sister, Britton grabbed him and tackled him on the concrete ground.

77.     After tackling him on the ground, Defendant Britton held J.C. down on the ground.

**Defendant Sharrock's Use of Force**

78.     Only two seconds after Britton tackled J.C. and held him down on the ground, Defendant Sharrock tased J.C. twice.[3] Below is a screen capture from body worn video showing Britton on top of J.C. while Defendant Sharrock tased J.C. twice.



---

[3] According to the incident report, Taser cartridges serial numbers X482K4HN4 and X492K49WM were deployed into J.C.

79.    J.C. was not threatening any officer or other person immediately prior to when Defendant Sharrock tased him twice as J.C. never raised his voice nor made any verbal threats toward Defendant or any other person.

80.    J.C. was not actively resisting arrest prior to when Defendant Sharrock tased him twice as J.C. was on the ground with hands and legs clearly visible as Defendant Britton holding him down on the ground.

81.    Additionally, at no point did the deputies and corporal inform J.C. that he was under arrest.

82.    J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Sharrock tased him twice as J.C. was on the ground with hands clearly visible while Defendant Britton held him down on the ground.

83.    Here, although J.C. had previously failed to immediately comply with the directive that he put his hands behind his back by Britton prior to being tased twice by Defendant Sharrock, a reasonable jury could find the amount of force which Defendant Sharrock exerted to exceeded the need as J.C. was on the ground with hands clearly visible not holding a weapon and curled up in pain from the agony of being tased with Defendant Britton holding him down on the ground.

**<u>Defendant Frias' Use of Force</u>**

84.    Two seconds after Defendant Sharrock finished tasing J.C., Defendant Frias tased J.C .and drive stunned him twice. Below is a screen capture from body worn camera footage showing J.C. screaming in agony as Defendant Frias drive stunned him twice and tased him.





85.    J.C. was not threatening any officer or other person immediately prior to when Defendant Frias tased and drive stunned him twice as J.C. never raised his voice nor made any verbal threats toward Defendant or any other person.

86.    J.C. was not actively resisting arrest prior to when Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain with the agony of being tased while Defendant Britton held J.C.'s left arm down and J.C. grasped his chest with his right arm.

87.    J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain with the agony of being tased while Defendant Britton held his left arm down and J.C. grasped his chest with his right arm.

88.    Here, a reasonable jury could find the amount of force which Defendant Frias exerted exceeded the need as J.C. was on the ground with hands clearly visible not holding a weapon and curled up in pain from the agony of being tased while Defendant Britton held his left arm down and J.C. grasped his chest with his right arm.

89.     After the incident, Deputy Britton told J.C.'s mother that they were going to bring J.C. home, <u>but in order to have him in the back of their vehicles they needed to handcuff him.</u>

90.     Defendant Britton's statement to J.C.'s  mother that they were going to bring J.C. home, <u>but in order to have him in the back of their vehicles they needed to handcuff him</u> demonstrates that Defendants Britton and White had the ability to not detain J.C. once they knew he was not a threat,  did not commit a crime and was not armed with a weapon since they had <u>searched the backpack</u> left behind by J.C.'s friend <u>confirming J.C did not have a weapon and witnesses had stated a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival</u>; however, Defendants White and Britton illegally detained J.C.by informing him he was detained and requesting that he place his hands behind his back.

91.     As a result of the illegal detention, J.C. suffered deprivation of his liberty.

92.     Due to the excessive force, J.C. suffered injuries physical injuries including scarring and bruises from being tased and drive-stunned as well as mental anguish, physical pain, and suffering.

93.     These injuries were not caused by any other means.

94.     Defendants were at all times acting under the color of law.

**IV.**
**CAUSES OF ACTION**

**Count One**

**Illegal Detention**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Britton and White**

95.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

96.    No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

97.    Unlawful detention implicates the Fourth Amendment's proscription against unreasonable seizures. *Peterson v. City of Fort Worth, Tex*., 588 F.3d 838, 845 (5th Cir. 2009) See *Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

98.    Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20; *United States v. Brigham*, 382 F.3d 500, 506-07 (5th Cir.2004) (en banc); *U.S. v. Lopez–Moreno*, 420 F.3d 420, 429–434 (5th Cir.2005).

99.    The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States*

*v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

100.    Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir.2002).

101.    In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvizu*, 534 U.S. at 274.

102.    In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S. at 27.

103.    As for the second prong of the *Terry* inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507.

104.    Moreover, *Terry* does not permit police officers to detain suspects indefinitely to complete an investigation. *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

105.    J.C. calmly told the deputies that he did not have a gun.

106.    J.C. gave the deputies and corporal permission to search the backpack for a gun.

107.    The deputies and corporal did not find a gun after searching the backpack.

108.    Witnesses at the scene stated that a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival.

109.     Here, when Defendants ascertained that J.C. was not a threat, was not armed with a weapon, and had committed no crime there was no justification for his detention.

**<u>Prolonged Detention</u>**

110.    Under *Terry*, an officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. See *Illinois v. Wardlaw*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (reiterating that reasonable suspicion is ―more than an inchoate and unparticularized suspicion or hunch‗ of criminal activity‖); *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989); *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000).

111.    After completion of the purposes of the initial stop, the officer must have reasonable suspicion to believe that further criminal activity has occurred or is being committed to justify further detention of the suspect. *See Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997) (en banc); *McQuarters v. State*, 58 S.W.3d 250, 255 (Tex. App.—Fort Worth 2001, pet. ref‗d; *Sieffert v. State*, 290 S.W.3d 478, 485–86 (Tex. App.—Amarillo 2009, no pet.).

112.    To protect important Fourth Amendment interests, the Supreme Court has circumscribed Terry stops to brief seizures designed to allow police to diligently employ investigative methods in order to quickly verify or dispel their suspicions. *Royer*, 460 U.S. at 500.

113.    Despite having information that J.C. had not committed any crimes <u>and that he did not have a gun</u>, Britton and White decided to keep J.C. further detained by informing him he was detained and requesting that he place his hands behind his back.

114.    Below is a screen capture of Defendant Frias' narrative in the incident report where he states "Deputy White advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and location prior to our arrival. Due to the information that was gathered and the subject that was being questioned was 16 years of age I directed Deputy White and Britton to take custody of the subject being questioned and that we

would be taking home to locate his brother and release the subject to his parents after informing the parent of the nature of the call."

> On 6-6-23, I Lt. Frias #4701 at 6:28pm was dispatched to a Man with a Gun call at the Buckingham pool area. Upon arrival several deputies from Kaufman County Sheriff's Dept. and Pct#2 were already on scene investigating the nature of the call. Call notes advised that a tall big black male subject was possibly in possession of a firearm at the location. Upon arrival deputies were conducting an interview with a male matching the description. Deputy White advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and left the location prior to our arrival. Due to that information that was gathered and that the subject that was being questioned was 16 years of age I directed Deputy White and Britton to take custody of the subject being questioned and that we would be taking home to locate his brother and release the subject to his parent after informing the parent of the nature of the call.

115.    Notably, the deputies told J.C. that he was being detained so they could take him to his house to further investigate the situation and find out the possible whereabouts of the gun.

116.    Defendants Britton and White had the ability to not detain J.C . once they knew he was not a threat, did not commit a crime and was not armed with a weapon since deputies  had searched the backpack left behind by J.C.'s friend confirming J.C did not have a weapon and witnesses had stated a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival; however, Defendant Britton and White further detained J.C. by informing him he was detained and requesting that he place his hands behind his back.

117.    After Defendant Britton searched the backpack confirming he did not have a weapon and that witnesses had stated a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival, the reason for the initial contact had concluded. However, Defendants Britton and White then further intentionally detained Plaintiff without a warrant, without Plaintiff's consent, and without any legal justification as

Defendants Britton and White told J.C. hat he was detained and instructed him to place his hands behind his back.

118.     Defendants Britton and White did not have probable cause nor reasonable suspicion to support detaining J.C. after searching the backpack left behind by J.C.'s friend confirming J.C. did not have a weapon and being told by witnesses that a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival, as J.C. was not suspected of committing a crime or in the process of committing a crime when he was told he was being detained and instructed to put his hands behind his back.

119.     Defendants Britton and White intentionally detained Plaintiff without a warrant, without Plaintiff's consent, and without any legal justification.

120.     J.C. did not consent to his confinement and was conscious of it.

121.     Defendants Britton and White willfully detained J.C.by telling him he was being detained and telling him to put his hands behind his back.

122.     J.C. did not consent to the detention.

123.     Defendants Britton and White did not have probable cause to support detaining J.C.

124.     Defendants Britton and White did not have authority of law to detain J.C.

125.     By knowingly and intentionally detaining J.C. without consent, without probable cause, and without legal justification, Defendants Britton and White deprived J.C. of his Fourth Amendment right to be free from unreasonable seizures.

126.    As a result of the illegal detention, J.C. suffered injuries and losses to his rights and freedoms.

127.    As a result of the illegal detention, Defendants Britton and White deprived J.C. of his civil, constitutional, and statutory rights and are liable to H.W. under 42 U.S.C. § 1983.

**Count Two**

**Excessive Force**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Sharrock and Frias**

128.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

129.    Acting under the color of law, Defendant Frias and Defendant Sharrock deprived J.C. of the rights and privileges secured to him by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

130.    J.C. brings this cause of action pursuant to 42 U.S.C. § 1983.

131.    The amount of force used by Defendants when Defendant Frias tased and drive stunned him twice, and Defendant Sharrock tased him twice was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon J.C.

132.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

133.    A constitutional violation occurs when an officer **tases**, strikes, or violently slams **an arrestee who is not actively resisting arrest**. *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).

134.    Fifth Circuit case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *Darden,* 880 F.3d at 731.

135.    Fifth Circuit case law makes clear that an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009).

136.    Force must be reduced once a suspect has been subdued. Notably, "subdued" does not mean handcuffed." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020).

137.    Once a suspect is "subdued" and "no longer resisting, an officer's subsequent use of force is excessive." *Joseph*, 981 F.3d at 341 (5th Cir. 2020) ("continuing to inflict force despite [a suspect] committing no crime, posing no threat, and giving no active resistance" violates clearly established law); *Newman v. Guedry*, 703 F.3d 757, 764 n.8 (5th Cir. 2012)*(*officer "should have known that he could not continue to shock the suspect with the taser after he was no longer resisting arrest"): *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015)).

138.    This idea has been reinforced by the Courts, "To be sure, Ordonez had just fled from Gonzalez and Pineda's attempt to arrest her for interference, shortly before Gonzalez, Hernandez, and Campa used force against her. Some force may have therefore been justified to subdue Ordonez."  *See Ordonez et al. v. Gonzales et al*., No. EP-23-CV-99-KC, 2024 WL 1250181, at *23-24 (W.D. Tex. Mar. 25, 2024) (citing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (*Saucier v. Katz*, 533 U.S. 194, 208 (2001); and then citing *Graham* v. Connor, 490 U.S. 386 (1989).

139.    The Court continued, "but taking Plaintiffs' allegations as true, once Ordonez was taken to the ground, she no longer attempted to resist or evade arrest. Therefore, the force used

against her while she was on the ground—Gonzalez, Hernandez, and Campa putting their full body weight on her, restricting her breathing, and Gonzalez slamming Ordonez's head into the ground—was objectively unreasonable." *Id*; (citing *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024); *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018); *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018); *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012)).

140.    Like Ordonez, even though J.C. had previously turned and two steps when he was tackled by Defendant Britton, Defendants Frias and Sharrock were not justified in their actions after J.C. had been subdued by Defendant Britton taking J.C.to the ground, as J.C. was no longer attempted to resist or evade. *Id*.

141.    Although officers may need to use "physical force ... to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman*, 703 F.3d at 763 (5th Cir. 2002); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

142.    The Fifth Circuit has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need. *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017)*; See Newman*, 703 F.3d at 763 (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to' " force); *Deville*, 567 F.3d at 168 (determining that "[a] reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle").

143.    In *Trammell*, the Fifth Circuit found that "given that only three seconds elapsed between Officer Fruge's initial request that Trammel place his hands behind his back and when Officers Fruge, Garza, and Neveu tackled Trammel, we find that a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required "measured and ascending" actions calibrated to Trammel's conduct." *Trammell*, 868 F.3d at 342.

144.    Here Defendant Sharrock tased J.C. twice only two seconds after Britton had tackled him.

145.    Here, Defendant Frias tased and drive stunned J.C. twice after only two seconds Defendant Sharrock had tased him twice.

146.    Just as in *Trammell*, where the Fifth Circuit found that a jury could determine that using force after only three seconds was unreasonable, a jury could find that Defendant Sharrock tasing J.C. twice (only two seconds after Britton tackled J.C.) was unreasonable and an excessive use of force. *Id*; see also *See Autin v. City of Baytown, Tex.*, 174 Fed. Appx. 183, 186 (5th Cir.2005) (per curiam) (without support of the Graham factors, nothing "would have indicated to a reasonable officer that repeatedly tasing a woman while forcing her to the ground was lawful conduct"); *Anderson v. McCaleb*, 480 Fed. Appx. 768, 773 (5th Cir.2012) (per curiam) (deciding that based on the Graham factors, the officer "should have known that he could not continue to shock [the suspect] with the taser after he was no longer resisting arrest").

147.    Just as in *Trammell*, where the Fifth Circuit found that a jury could determine that using force after only three seconds was unreasonable, a jury could find that Defendant Frias tasing and drive stunning J.C. twice (only two seconds after Sharrock had tased him twice) was unreasonable and an excessive use of force. *Id*.

148.    Here, it was objectively unreasonable for Defendant Frias to tase and drive stun J.C. twice and Defendant Sharrock to tase J.C. twice when J.C. was not actively resisting arrest. *Darden,* 880 F.3d at 731; *Newman*, 703 F.3d at 763; *Bush*, 513 F.3d at 502; see also *Graham*, 490 U.S. at 396.

149.    J.C. was not suspected of committing a violent or serious offense when Defendant Frias tased and drive stunned him twice and Defendant Sharrock tased him twice as the <u>deputies and corporal searched the </u>backpack left behind by J.C.'s friend confirming J.C. did not have a weapon and that witnesses had stated a male juvenile who was accompanying J.C. had left the scene <u>with a weapon prior to the deputies and corporal's arrival.</u>

150.    As J.C. was not suspected of any offense this "militates" against the use of force. *Trammell*, 868 F.3d 332 at 340 citing *Reyes v. Bridgwater*, 362 Fed. Appx. 403, 407 n.5 (5th Cir. 2010) (finding the "severity" factor from *Graham* "militated" against a use of force where the alleged crime was a misdemeanor).

151.    In Texas, the use of force to resist an arrest is justified: (1) if, before the actor offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's use or attempted use of greater force than necessary. Tex. Penal Code Ann. § 9.31.

152.    This means that in Texas, if an officer decides to arrest a person and in doing so uses excessive force to affect that arrest, then the person is justified in offering physical resistance to protect themself from the officer's use of excessive force. Tex. Penal Code Ann. § 9.31.

153.    Defendants Frias' use of force by tasing and drive stunning him twice and Defendant Sharrock tasing him twice was greater force than was necessary to detain J.C. despite there being no legal justification for detaining him in the first place.

154.    Thus, J.C. would have been reasonably justified in defending himself from Defendant Frias and Defendant Sharrock's use of force.

155.    However, J.C. did not even use force to resist Defendant Frias and Defendant Sharrock by striking, pushing, or grabbing Defendants, but instead, in response to the excessive force used by Defendants, J.C. simply attempted to refrain from being unnecessarily assaulted by curling up in a ball and screaming in agony while being tased and drive stunned.

156.    When Defendant Frias tased and drive stunned him twice and Defendant Sharrock tased him twice while Britton held J.C. on the ground he was not a danger or threat to Defendants or any other person as he never raised his voice nor made any verbal threats toward Defendants was not holding a weapon as his hands were empty and visible, had been causally speaking to the officers for fourteen minutes without any form of aggression, and was not suspected of committing any criminal offense let alone a violent or serious offense as the deputies and corporal had searched the backpack left behind by J.C.'s friend confirming J.C.  did not have a weapon and that witnesses had stated a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival.

157.    J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape when Defendant Frias tased and drive stunned him twice and Defendant Sharrock tased him twice while Britton held J.C. on the ground.

158.    J.C. was not actively resisting arrest prior to Defendant Frias tased, and drive stunned him twice and Defendant Sharrock tased him twice while Britton held J.C. on the ground.

159.    A reasonable officer would know that the use of force is <u>clearly excessive</u> when engaging with minors such as J.C. who was not threatening any officer or other person, was not suspected of committing any serious or violent crime, was not attempting to flee, was not actively resisting arrest, and who the use of force was not warranted.

160.    A reasonable officer would know that the use of force is <u>clearly unreasonable</u> when engaging with minors such as J.C., who was not threatening any officer or other person, was not suspected of committing any serious or violent crime, was not attempting to flee, was not actively resisting arrest, and who the use of force was not warranted.

161.    A reasonable officer in Defendants' position would know that tasing and drive stunning J.C. was objectively unreasonable when J.C. was not suspected of committing a violent nor serious crime, was not attempting to flee, was not resisting arrest, was unreasonable and excessive.

162.    As a direct result of the force used against him by Defendants, J.C. has suffered physical injury, pain, and mental anguish for which he sues herein.

163.    These injuries were not caused by any other means.

## V.
## <u>PUNITIVE DAMAGES</u>

164.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

165.    When viewed objectively from the standpoint of Defendants at the time of the occurrence, Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

166.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants which was recklessly or callously indifferent to Plaintiff's

protected rights, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

167.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

168.    J.C.'s injuries were a foreseeable event.

169.    Those injuries were directly and proximately caused by Defendants Britton and White's illegal detention and Defendant Frias and Sharrock's excessive and unreasonable use of force against J.C.

170.    As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends said Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to J.C.'s legally protected rights.

171.    Thus, Plaintiff is entitled to punitive damages against the Defendants.

172.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, J.C. was forced to suffer:

    a.  Deprivations of his liberty,
    b.  Physical injuries,
    c.  Physical pain and suffering, and
    d.  Mental anguish.

173.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

174.    If Plaintiff prevails in this action on claims pursuant to 42 U.S.C. § 1983, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

## VIII.
## JURY REQUEST

175.    Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which the Court finds that Plaintiff is justly entitled.

Respectfully submitted,

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@palmerperlstein.com
breanta@palmerperlstein.com
scott@palmerperlstein.com

**COUNSEL FOR PLAINTIFF**