IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHERION PRICE, on behalf of her minor son, J.C., | § § § | |
| Plaintiff, | § § | |
| V. | § § | No. 3:24-cv-1387-L |
| ISEAH WHITE, ET AL., | § § § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Cherion Price, on behalf of her minor son, J.C., filed a complaint under 42 U.S.C. § 1983 against Defendants Iseah White, Antonio Britton, Guadalupe Frias, and Mark Sharrock, peace officers employed by Kaufman County Constable Precinct No. 2 (collectively, the "Deputies"), alleging that the Deputies violated J.C.'s rights under the Fourth Amendment by illegally detaining him and using excessive force. *See* Dkt. No. 1.

The Deputies move to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6), asserting qualified immunity. *See* Dkt. No. 6.

United States District Judge Sam A. Lindsay referred the motion to dismiss to the undersigned United States magistrate judge for hearing, if necessary, and for recommendation under 28 U.S.C. § 636(b). *See* Dkt. No. 8.

Price responded to the motion. *See* Dkt. No. 7. And the Deputies replied. *See* Dkt. No. 9.

The undersigned now enters these findings of fact, conclusions of law, and

recommendation that, for the reasons and to the extent set out below, the Court should deny the motion to dismiss.

## Legal Standards

### I.    Federal Rule of Civil Procedure 12(b)(6)

Considering a motion under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). Even so, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Cf. Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122, at *3 (5th Cir. Mar. 1, 2024) ("[J]ust as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation.").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. So, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up; quoting *Twombly*, 550 U.S. at 557); *see, e.g.*, *Parker v. Landry*, 935 F.3d 9, 17 (1st Cir. 2019) (Where "a complaint reveals random

puffs of smoke but nothing resembling real signs of fire, the plausibility standard is not satisfied.").

While Federal Rule of Civil Procedure 8(a)(2) does not mandate detailed factual allegations, it does require that a plaintiff allege more than labels and conclusions. So, while a court must accept a plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

And, so, a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.*; *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) ("[T]he court does not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" (quoting *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162-63 (5th Cir. 2021))).

Accordingly, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)).

Aside from "matters of which judicial notice may be taken under Federal Rule of Evidence 201," *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted), a court cannot look beyond the pleadings

in deciding a Rule 12(b)(6) motion, *see Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *see also Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (Federal Rule of Evidence 201(d) "expressly provides that a court 'may take judicial notice at *any* stage of the proceeding,' and our precedents confirm judicially noticed facts may be considered in ruling on a 12(b)(6) motion." (citations omitted)).

Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *see also Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019) ("The Civil Rules provide that an attachment to a complaint generally becomes 'part of the pleading for all purposes,' including for ruling on a motion to dismiss." (quoting FED. R. CIV. P. 10(c); citations omitted)).

And, "[w]hen 'an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls.'" *Rogers v. City of Yoakrum*, 660 F. App'x 279, 285 n.6 (5th Cir. 2016) (per curiam) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) (citing, in turn, *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940))).

Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.

1993)).

And, while the United States Court of Appeals for the Fifth Circuit "has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011).

But, "if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

## II.    Qualified Immunity

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned up).

"But government officials performing discretionary duties" can respond to such a claim by asserting qualified immunity. *Id.* at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

And, if they do, a court must consider each official's actions separately, *see Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007), on an expedited basis, *see Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), "because qualified

immunity is 'not simply immunity from monetary liability' but also 'immunity from having to stand trial,'" *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018)).

Qualified immunity is a basis to dismiss a lawsuit under Rule 12(b)(6).

And, "[w]here public officials assert qualified immunity in a motion to dismiss, [district courts] must rule on the motion." *Carswell v. Camp*, 54 F.4th 307, 310, 311 (5th Cir. 2022).

But, because a plaintiff "need not anticipate a qualified immunity defense," *Fisher v. Dall. Cnty.*, 299 F.R.D. 527, 532 (N.D. Tex. 2014), the Rule 12(b)(6) standards are "not heightened … [w]hen a plaintiff pleads a § 1983 claim that implicates qualified immunity," *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) (citation omitted).

Instead, a plaintiff need only "plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Allen*, 65 F.4th at 744 (quoting *Arnold*, 979 F.3d at 267). That is, "a plaintiff must plead qualified-immunity facts with the minimal specificity that would satisfy *Twombly* and *Iqbal*." *Arnold*, 979 F.3d at 267; *accord Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) ("[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."); *Babinski v. Sosnowsky*, 79 F.4th 515, 519-20 (5th Cir. 2023) ("A plaintiff

attempting to overcome qualified immunity at the Rule 12(b)(6) stage must plead facts that allow this court to reasonably infer that the defendant is liable for the harm alleged." (citation omitted).

Or, put another way, because the "qualified-immunity inquiry is two-pronged," *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)), to survive a motion to dismiss asserting qualified immunity, a plaintiff's pleading must yield a "yes" to two questions:

- Do "the facts, viewed in the light most favorable to the party asserting the injury, [plausibly allege] that the official's conduct violated a constitutional right"? *Id.* at 190-91 (citing *Garcia*, 957 F.3d at 600).

- Was "the right at issue … 'clearly established' at the time of the alleged misconduct"? *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232).

At the pleadings stage, the first question is typically straightforward. *Cf. Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) ("The defense of qualified immunity 'alters the usual summary judgment burden of proof.' Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." (citations omitted)).

But, regardless of when it's considered, the clearly established question can be "a doozy." *Morrow*, 917 F.3d at 874. That is, "[t]he 'clearly established' prong is difficult to satisfy." *Cunningham*, 983 F.3d at 191; *cf. Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) ("We are bound by the restrictive analysis of 'clearly established' set forth in numerous Supreme Court precedents.").

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34.

And the plaintiff "must show that the law was 'sufficiently clear' at that time 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova*, 994 F.3d at 726 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

"There are two ways to demonstrate clearly established law" and meet this additional burden to make this second showing. *Id.*

Typically, the plaintiff must "'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances was held to have violated the Constitution.'" *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (cleaned up); *accord Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (A clearly established right must be supported by "controlling authority – or a 'robust consensus of [cases of] persuasive authority' – that defines the contours of the right in question with a high degree of particularity." (quoting *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011))); *see, e.g.*, *Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established."

- 8 -

(footnote omitted)).

"It is the plaintiff's burden to find a case in her favor that does not define the law at a high level of generality." *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (cleaned up; quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018)). Thus, the "clearly established law" "must be 'particularized' to the facts of the case." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up). And a clearly established right must be defined "with specificity." *Cunningham*, 983 F.3d at 191 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citations omitted).

"In other words, 'there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.'" *Cunningham*, 983 F.3d at 191 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

So, in sum, under the most common approach to this prong, while the "clearly established right … must be particularized to the facts of the case establishing the right," *Harris v. Clay Cnty., Miss.*, 47 F.4th 271, 277 (5th Cir. 2022) (cleaned up), because "[t]he touchstone of the inquiry is 'fair notice,'" "[d]istinctions between cases

are thus relevant only if they make the applicability of prior precedent unclear," *Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023) (citations omitted). That is, "[a] plaintiff need not show that the very action in question has previously been held unlawful. The test is whether every reasonable official would know that their actions are unconstitutional. [And, so, a]t the end of the day, [what is absolutely necessary] is fair warning." *Stevenson v. Tocé*, 113 F.4th 494, 504 (5th Cir. 2024) (cleaned up).

Under the second approach to demonstrating clearly established law, a plaintiff asks the Court to look to "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018)); *accord Batyukova*, 994 F.3d at 726.

"[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque*, 993 F.3d at 335 (cleaned up; quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

But "[t]he standard for obviousness is sky high." *Joseph*, 981 F.3d at 338.

And, so, "plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious,'" *Cope*, 3 F.4th at 206 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (per curiam)), because qualified immunity should "not immunize those officials who commit novel, but patently 'obvious,' violations of the Constitution," *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)); *see, e.g., Harris*, 47

F.4th at 279 ("Detaining Harris for more than six years after he should have been released under Supreme Court precedent and a state court order is a violation of clearly established law. Qualified immunity thus does not protect Huffman and Scott."); *Tyson*, 42 F.3d at 520 ("It is obvious that the right to bodily integrity forbids a law enforcement officer from sexually abusing a person by coercing them to perform nonconsensual physical sex acts for his enjoyment").

## Analysis

It is alleged that Deputies White and Britton unconstitutionally detained J.C., while Deputies Frias and Sharrock used unconstitutionally excessive force against him. *See, e.g.*, Dkt. No. 1 at 16-27. To determine whether any individual defendant is entitled to qualified immunity, and therefore dismissal of the claims against him, the Court must consider each defendant's individual role in the separate Section 1983 claims. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017) ("To be liable under § 1983, [an officer] must have been personally involved in the alleged constitutional deprivation or have engaged in wrongful conduct that is causally connected to the constitutional violation.").

But the Court must first resolve whether the complaint plausibly alleges that J.C. possessed a gun at some point prior to the Deputies' arrival at the pool.

As Price summarizes the applicable allegations in response to the motion to dismiss,

> [s]ecurity guard Shana Cowen approached J.C. after receiving a report about a male at the pool with a gun. J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go.

Deputy Iseah White from the Kaufman County Constable's Office Precinct 2, and Deputy Snow from the Kaufman County Constable's Office responded to the pool after receiving a report from Cowen about a male at a pool with a gun. J.C. calmly told the deputies that he did not have a gun and informed them that his "brother," who was actually a close friend, had a backpack and had previously left the pool. Deputy Antonio Britton, Lieutenant Guadulupe Frias, and Corporal Mark Sharrock also from the Kaufman County Constable Office Precinct 2, arrived at the scene and joined Deputy White in questioning J.C. who was cooperating fully with the investigation. J.C. led the deputies to the backpack left behind by his friend and when requested, gave the deputies permission to search the backpack left behind by J.C.'s friend.

Deputy Britton did not find a gun after searching the backpack. Witnesses at the scene stated that a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the deputies and corporal's arrival. Despite having information that J.C. had not committed any crime as he did not have a gun, Deputy Frias instructed Deputy White and Deputy Britton to illegally detain J.C. Then, White and Britton illegally detained J.C. by informing him he was detained and requesting that he place his hands behind his back so they could take him to his residence. J.C. said, "hold up" and turned and took two steps in the direction of his sister who was observing the entire encounter from a bench on the other side of the pool so he could tell her that he was being detained.

Britton tackled J.C. on the ground. While Deputy Britton held J.C. down as Corporal Mark Sharrock tased J.C. twice and Deputy Guadalupe Frias tased and drive stunned him twice.

Dkt. No. 7 at 7-8 (cleaned up).

But, according to the Deputies, the Court must consider the content of the incident report attached to their motion to dismiss, *see* Dkt. No. 6 at 16; Dkt. No. 6-1; Dkt. No. 9 at 3-5, a report that Price references – indeed, incorporates excerpts from – several times in the complaint, *see* Dkt. No. 1 at 8, 10, & 19.

That report recounts, in part, that Cowen received a report from "an adult female at the pool inform[ing] her that she saw a young male with a gun"; that Cowen "then confirmed with [J.C.] that he did have a gun and advised him that no guns were allowed at the property"; that the Deputies "questioned [J.C.] concerning the

statement made by [Cowen]"; that J.C. "stated that he and his brother had a backpack, but that there was no weapon in the backpack and that he did not have a gun in his possession or previously"; that J.C. "gave permission for Deputies to check the contents of the backpack which confirmed there was no gun in the bag"; that "[w]itnesses on scene stated that a male juvenile was accompanying [J.C.] and left the scene with the weapon prior to Deputy arrival"; and that, "[b]ased on this information, Deputies determined that [J.C.] would remain detained to further investigate the situation and the possible whereabouts of the gun." Dkt. No. 6-1 at 4.

And, so, the Deputies argue that "Plaintiff's contention that there was nothing to indicate that J.C. had a gun is contradicted by Plaintiff's factual allegations and the Incident Report," because, "[w]hen the evidence referenced in a plaintiff's complaint blatantly contradicts the factual allegations in the complaint, the evidence should be adopted over the factual allegations." Dkt. No. 9 at 3-4 (citing *Harmon*, 16 F.4th at 1163 (citing, in turn, *Scott v. Harris*, 550 U.S. 372, 380 (2007)), and concluding that, "[a]t some point, J.C. had a gun – it's in Plaintiff's complaint by reference" and that "[t]he evidence contradicts Plaintiff's contention in the response").

**I.    The Court should not consider the incident report attached to the motion to dismiss a part of the pleadings.**

To determine whether it has been plausibly alleged that J.C. possessed a gun at some point, the Court should first consider *Scott*'s limited holding as to summary judgment burdens, which, relatively recently, has been extended to the pleadings stage.

In *Scott*, the Supreme Court reversed the denial of summary judgment to defendant police officers based on their assertion of

qualified immunity. The district court held that the plaintiff's version of the facts created a genuine dispute of material fact. The plaintiff had been involved in a high-speed vehicle chase and was pushed off the road by the chasing police officer; the plaintiff alleged a set of facts greatly downplaying the dangerousness of his efforts to elude officers, thereby creating a basis to argue excessive force was used. Despite the usual rule that courts should adopt the plaintiff's version of the facts when the defendant moves for summary judgment, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." A court "should not rely on such visible fiction" and should "view the facts in the light depicted by the videotape." The "record" in *Scott* that created the blatant contradiction was the video of the chase.

*Garcia v. Orta*, 47 F.4th 343, 350 (5th Cir. 2022) (cleaned up); *see also id.* at 350 n.2 ("The *Scott* opinion does not limit its holding to video evidence, instead referring to 'the record.' [And] courts have applied this holding using other types of evidence capable of utterly discrediting the plaintiff's version of the facts," including video and audio from dashcams; taser logs; and still photos. (citations omitted)).

Even so, "*Scott* was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence." *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) (citing *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018)).

"Rather, *Scott* was an exceptional case with an extremely limited holding": "Only when the record eliminates any feasible claim that the nonmovant's account of events is true may a court disregard the normal summary judgment rule that it must credit that party's account if it is supported by sufficient evidence," which "is a difficult and demanding standard." *Id.* at 410-11 (cleaned up); *see, e.g., Ramirez v.*

*Martinez*, 716 F.3d 369, 374-75 (5th Cir. 2013) (Where a video does not capture "every particular element of [an] altercation" it would not necessarily "blatantly contradict [a plaintiff's] version of the facts" supported by evidence.).

Still, as the case that the Deputies cite on reply demonstrates, *Scott*'s limited holding has been extended to the pleadings stage, and, so, "where video recordings are included in the pleadings … the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon*, 16 F.4th at 1163 (quoting *Scott*, 550 U.S. at 380; footnote omitted); *see also Sligh v. City of Conroe, Tex.*, 87 F.4th 290, 298 (5th Cir. 2023) (per curiam) ("If an allegation is qualified by the contents of an exhibit attached to the pleadings, but the exhibit instead contradicts the allegation, 'the exhibit and not the allegation controls.' Here, the Video was attached to Montgomery County and Montes's joint motion to dismiss and referenced by Sligh in her operative complaint. Accordingly, to the extent that the Video contradicts Sligh's allegations, the Video controls." (quoting *Riley*, 355 F.3d at 377)).

As *Sligh*, applying the rule from *Simmons/Riley* indicates, for the video to control requires a clear – or genuine – conflict between what it depicts and what is alleged, considered on a fact-by-fact basis. *See Kokesh v. Curlee*, 14 F.4th 382, 385 n.2 (5th Cir. 2021) ("Although all alleged facts are taken as if they are true, facts established by a video record control when they clearly contradict the facts contained in a pleading…. There are several points of material fact on which the video clearly

contradicts Kokesh's alleged facts. On these facts, the video will control." (citing *Scott*, 550 U.S. at 380-81; *Riley*, 355 F.3d at 377)); *see also Hoffman v. L & M Arts*, No. 3:10-cv-953-D, 2011 WL 3567419, at *9 (N.D. Tex. Aug. 15, 2011) (*Simmons* "instruct[s] that a genuine conflict between the complaint and a pleading exhibit requires that the court accept the exhibit rather than the factual allegations as true.").

And, as with how it's applied to motions for summary judgment, *Scott*'s holding, when applied at the pleadings stage, is not limited to video footage included in the pleadings.

But, again, for the Court to consider such exhibits, they must clearly or genuinely contradict a factual allegation. *See, e.g.*, *Stevenson*, 113 F.4th at 502-03 ("If an exhibit to a complaint contradicts an allegation in the complaint, the exhibit controls. But we find no contradiction. Stevenson's attachment of the letter merely acknowledges that Tocé claims that Sylvest did not recommend surgery. But there is no evidence from Sylvest himself indicating that he never recommended consultation with a surgeon." (citation omitted)); *Degenhardt v. Bintliff*, 117 F.4th 747, 754 n.5 (5th Cir. 2024) ("[T]he exhibit-exception to the default rule of crediting a well-pleaded complaint does not apply here" because the "stills from what appears to be dashcam footage from [Defendant's] perspective" are alone "insufficient to shed meaningful light on the [applicable] factual allegations.").

Here, Cowen's interaction with J.C. regarding whether he possessed a gun and what, if anything, Cowen then told the Deputies as to J.C.'s possession of a gun are material.

And, as to these material facts, there is a genuine conflict between the allegations and what the incident report states. *Compare* Dkt. No. 1, ¶¶ 9-11 ("Cowen approached J.C. after receiving a report about a male at the pool with a gun. J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go. [Deputies] responded to the pool after receiving a report from Cowen about a male at a pool with a gun."), *with* Dkt. No. 6-1 at 4 (Cowen "then confirmed with [J.C.] that he did have a gun and advised him that no guns were allowed at the property." The Deputies "questioned [J.C.] concerning the statement made by [Cowen].").

But, before the Court may consider the incident report, the Court must determine whether the incident report, not attached to the complaint but to the motion to dismiss, is "considered part of the pleadings." *Collins*, 224 F.3d at 498-99; *cf. Hodge v. Engleman*, 90 F.4th 840, 844-45 (5th Cir. 2024) ("Although the court may rely on documents that the pleadings incorporate by reference, Hodge did not attach the video evidence to the pleadings, nor did the pleadings refer to the videos sufficiently to incorporate them. Therefore, by reviewing the 'appended video evidence,' the district court moved beyond the pleadings and to the summary judgment stage." (citations omitted)).

To be considered part of the pleadings, the incident report must (1) be "referred to in [Price's] complaint" and (2) be "central to [Price's] claim." *Collins*, 224 F.3d at 499.

To meet the second prong, the incident report must be "necessary to establish

- 17 -

an element of one of [Price's] claims," not "merely evidence of an element of [a] claim." *Kaye*, 453 B.R. at 662; *cf. Collins*, 224 F.3d at 499 ("In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated.").

The first prong is met here where Price incorporates into the complaint excerpts from the incident report. *See* Dkt. No. 1 at 8, 10, & 19.

But, "[u]nlike a breach of contract case, in which the contract is itself a fact that the plaintiff must prove," *Kaye*, 453 B.R. at 662, the incident report is merely evidence – evidence that Price need not rely on to prove her claims.

That excerpts from the incident report appear in the complaint "does not change this fact." *Id.* at 662-63 ("The Report may be the only source of information available to [Price] at this stage of the proceedings, but that does not make the Report necessary for demonstrating [a violation of the Fourth Amendment]."). *Compare, e.g.*, *Robles v. Ciarletta*, 797 F. App'x 821, 832 (5th Cir. 2019) (per curiam) ("The Robles' complaint referred to both the video and Ciarletta's report. Further, both pieces of evidence are central to Robles's claims. Robles's Fourteenth Amendment claim [that Ciarletta filed a false police report] is based entirely on Ciarletta's report. Similarly, Robles relies on the video from Campbell's camera as evidence that Campbell lacked probable cause to arrest him. Accordingly, the district court properly considered the evidence."), *with Orellana v. Terrebonne Par. Consol. Gov't*, Civ. A. No. 18-11673, 2019 WL 6036711, at *2 (E.D. La. Nov. 14, 2019) ("The police reports are not necessary to prove that there was a violation of Plaintiffs' Fourth or Fourteenth

Amendment rights [concerning the in-custody questioning of a child]. Although Plaintiffs may have referred to the contents of the first police report in their pleading, it is merely evidence of Plaintiffs' claims.").

And body or dash cam footage – providing a contemporaneous account that either confirms or negates what the state actor allegedly did – may be considered more than mere evidence of a Fourth Amendment violation, as such footage is more like a contract's terms and thus is "central to the plaintiff's claim." *Kaye*, 453 B.R. at 662; *see, e.g.*, *Benfer v. City of Baytown, Tex.*, 120 F.4th 1272, 1278 n.2 (5th Cir. 2024) (skipping the centrality prong of the analysis as to video footage: "Because the expert report, which is incorporated into Benfer's complaint, refers to Calvert's dash cam and bodycam footage, we may consider the footage at this stage.").

A related line of controlling authority further requires that the Court not rely on the incident report at this stage because, as to J.C.'s possession of the gun, the complaint "expressly rejects" that portion of the incident report. *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 & n.9 (5th Cir. 2018) (Peña's "characterization" – "that she was not suspected of any crime when she fled" – "is belied by the police reports [incorporated into her complaint], but on a motion to dismiss, Peña's well-pleaded factual allegations enjoy a presumption of truth" where the "complaint expressly rejects those elements of the police report that conflict with her account. Hence, for purposes of Rule 12(b)(6), we presume only that the officers made the assertions contained in the report, not that those assertions are in fact truthful." (citations omitted)); *see, e.g.*, *Delacruz v. City of Port Arthur*, No. 1:18-CV-11, 2019

WL 1211843, at *8 (E.D. Tex. Mar. 14, 2019) ("In *Peña*, the Fifth Circuit held that a plaintiff who was tased while running from the police had stated a cognizable claim for excessive force, as her complaint included a plausible allegation that she was not a criminal suspect when she fled, despite that characterization being contradicted by police reports that the plaintiff attached to her own complaint. This situation is analogous. Because the Complaint contradicts the report, 'we presume only that the officers made the assertions contained in the report, not that those assertions are in fact truthful.' Given this standard, Plaintiffs have sufficiently pleaded that Manuel initially was not under arrest or suspected of committing any crime." (citations omitted)); *cf. Armstrong*, 60 F.4th at 272 n.10 ("This police report was attached to the Law Enforcement Defendants' Rule 12(c) motion as an exhibit. Because this report is central to the allegations in the Complaint and Reply, this court may consider it," because "[t]his is not a case like *Peña* … , where the plaintiff's "complaint expressly reject[ed] those elements of the police report that conflict[ed] with her account."' (citations omitted)).

And, so, in sum, at the pleadings stage (and where a claim is not based on an allegedly false police report), courts may apply a different standard to an after-the-fact incident report that the allegations of a complaint expressly reject than to evidence such as a video that captured the incident at the time.

This difference in treatment makes sense for the reasons set out above. But it also reflects a structural limitation to considering qualified immunity based on the pleadings alone, a limitation that a district court may not now overcome by, for

example, converting the motion to dismiss to one for summary judgment, *see* FED. R. CIV. P. 12(d), after "which a district court may defer its qualified immunity ruling if further factual development[ – *i.e.*, discovery – ]is necessary to ascertain the availability of that defense," *Backe*, 691 F.3d at 648. And that is because the Fifth Circuit has now clarified that, if "public officials assert qualified immunity in a motion to dismiss, a district court must rule on the motion. It may not permit discovery against the immunity-asserting defendants before it rules on their defense." *Carswell*, 54 F.4th at 311.

## II.    The Court should not take judicial notice of the incident report to resolve the motion to dismiss.

The Court should also decline the Deputies' alternative request that it take judicial notice of the content of the incident report because "the incident report is [a] governmental record." Dkt. No. 6 at 16.

"Federal Rule of Evidence 201 states '[t]he court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Luna v. Am. Nat'l Ins. Co.*, EP-21-CV-00064-FM, 2021 WL 1911339, at *3 (W.D. Tex. May 12, 2021) (quoting FED. R. CIV. P. 201(d)).

> [And] the Fifth Circuit characterizes the standard for judicial notice as applying only 'to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities.' Examples of traditional uses of judicial notice include the recognition of certain treatises as reliable sources, the truth of facts found in dictionaries, and the application of established scientific principles.

*Id.* (quoting *Hardy v. Johns-Mansville Sales Corp.*, 681 F.2d 334, 347 (5th Cir. 1982); citations omitted).

And, while "[g]overnment documents have been found to hold facts of which a court may take judicial notice," "[p]ublication in a government document alone is not necessarily sufficient to render a fact so self-evident that no reasonable person could question it." *Id.* at *4 (further "inferr[ing] that the reason information contained in government documents is so often judicially noticed is due to 1) the facts being within the exclusive domain of the agency or key to its essential function; and 2) the legal and procedural safeguards to their accuracy").

Relatedly, as authority above further supports, the incident report is akin to a witness statement and thus "is not a source of information that cannot reasonably be questioned," as "[w]itnesses are routinely questioned and challenged by the discovery process through depositions and requests for documents that might contradict witness testimony." *Id.* at *3.

And, so, the Court should not consider the incident report attached to the motion to dismiss in ruling on the motion.

## III. The Court should deny the dismissal of the unlawful detention claim based on qualified immunity.

From Cowen first approaching J.C. to the Deputies informing J.C. that he was detained, it is alleged that,

> [o]n June 6, 2022, J.C., a sixteen-year-old boy, chaperoned his god sister and younger sister while attending a neighborhood pool with his friend.
> Security guard Shana Cowen approached J.C. after receiving a report about a male at the pool with a gun.
> J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go.
> Deputy Iseah White from the Kaufman County Constable's Office Precinct 2, and Deputy Snow from the Kaufman County Constable's Office responded to the pool after receiving a report from Cowen about

a male at a pool with a gun.

Cowen informed Deputy White and Deputy Snow that a tall, brown male that she had no idea if he was underage, eighteen, or nineteen years old put a gun away.

Deputy Snow asked if the male had the gun out since he had put it away.

Cowen stated that the male didn't have the gun out, but he had it in his pants.

Deputy White and Deputy Snow walked up to the pool and signaled for J.C.to step out of the pool.

J.C. immediately complied with the instruction to step out of the pool.

Deputy Snow asked J.C. how old he was.

J.C. answered that he was sixteen years old.

Deputy Snow asked J.C. if he had a firearm they needed to know about.

J.C. respectfully responded, "no sir."

Deputy Snow asked J.C. if he was sure if he did not have a firearm and if he had a backpack where it was located.

Deputy White asked what kind of backpack it was.

J.C. answered that "he [referring to his friend that was previously at the pool] just left so I don't know. He probably took it home. He's gone."

Deputy White asked J.C. if he had a backpack there at the pool.

J.C. shook his head no, and said he was not wearing a backpack.

Deputy White responded, "You ain't be wearing a backpack? All of y'all wear backpacks."

J.C. responded that he doesn't carry a backpack and doesn't need a backpack.

Deputy White asked if the male at the pool earlier was his brother.

J.C. responded that it was his little brother, but he has another brother.

Deputy White responded, "y'all look alike that's why I know that was your brother and y'all both got your twist in your hair."

Deputy Britton and Deputy Sharrock arrived at the scene and walked over to Deputy White and J.C.

The three deputies stood over J.C. who was seated in a chair and continued questioning him.

Deputy White told Britton and Sharrock "yeah, he talked to him then said he'd be right back. He left."

Deputy White told Deputy Britton and Deputy Sharrock that J.C. was the guy but did not have a backpack.

Deputy Britton asked J.C. if anyone had spoken to him about

having a gun.

J.C. answered that the pool lady [Ms. Cowen] asked if he had a gun because someone said they saw him with a firearm.

Deputy Britton asked if he had a gun and if he ever had one.

J.C. again stated no.

Deputy Sharrock questioned, "Did you pick up the backpack?

J.C. shook his head no.

Deputy Sharrock stated, "That's not what I'm being told. I mean there's cameras out here we can do it that way. I rather you just tell me the whole deal man."

J.C. again informed the deputies that his brother had a backpack, but he had already left.

J.C. walked over to the backpack that was left behind by his friend with Deputy White, Deputy Sharrock, and Deputy Britton.

Deputy Britton asked if J.C. cared if they looked through the backpack.

J.C. stated that they could.

Defendant Britton searched the backpack for a gun while Defendant White and Defendant Sharrock observed.

Defendant Britton did not find a gun after searching the backpack left behind by J.C.'s friend.

Deputy Britton asked J.C. how old he was.

J.C. informed Deputy Britton that he was sixteen years old.

Deputy Sharrock went to check the bathroom since witnesses had stated the male that was previously at the pool seen with the gun went into the bathroom.

Deputy Frias arrived at the scene.

Deputy Britton asked J.C. if he had his drivers license or school identification on him while Deputy White asked J.C. his first and last name.

J.C. provided his name and date of birth as requested and informed him he did not have identification with him.

Deputy White went to search the bathrooms for the gun.

A female witness came in the bathroom.

Deputy White asked if the female witness if she saw the gun and when she saw it what happened to it.

The female witness stated, "they jumped the fence."

Deputy White walked out back to Deputy Britton and Frias and informed them that the weapon was gone.

Deputy Frias stated, "if there was one."

Deputy White stated, "it was one."

When Deputy Frias asked how she knew this Deputy White informed him that the caller reported, "the brother that left jumped the fence and took off." …

- 24 -

Deputy Frias stated, "let's find out where he lives."

Deputy White asked J.C. for his address.

J.C. responded that he didn't know the name of the street as his family had just moved, but the street was about five streets down from their current location.

Defendant Frias told Defendants Britton and White to take J.C. home, check the brother out, and "He's with you. Cuffs or no cuffs I don't care but he's with you till we find the gun."

J.C. again informed the deputies that there was no gun.

[A] screen capture of Defendant Frias' narrative in the incident report ... states "Deputy White advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and location prior to our arrival. Due to the information that was gathered and the subject that was being questioned was 16 years of age I directed Deputy White and Britton to take custody of the subject being questioned and that we would be taking home to locate his brother and release the subject to his parents after informing the parent of the nature of the call."

Dkt. No. 1, ¶¶ 8-68 (cleaned up).

Price alleges that, once J.C. told the Deputies that he did not possess a gun and gave them permission to search his backpack, where they did not discover a gun, and where "[w]itnesses at the scene stated that a male juvenile who was accompanying J.C. had left the scene with a weapon prior to the [Deputies] arrival," "J.C. was not a threat, was not armed with a weapon, and had committed no crime," and, so, "there was no justification for his [continued] detention." *Id.*, ¶¶ 105-09.

But, even after "J.C. spoke calmly with the deputies for approximately fourteen minutes answering all of their questions," *id.*, ¶ 71, White and Briton "further detained J.C. by informing him he was detained and requesting that he place his hands behind his back," *id.*, ¶ 70; *see also id.*, ¶ 74. ("Defendants Britton and White all had the ability to not detain J.C. once they knew he was not a threat, did not commit a crime and was not armed with a weapon since Britton had searched the

backpack left behind by J.C.'s friend confirming J.C did not have a weapon and witnesses had stated a male juvenile who was accompanying J.C .had left the scene with a weapon prior to the deputies and corporal's arrival; however, Defendant Britton and White detained J.C. by informing him he was detained and requesting that he place his hands behind his back.").

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (citations omitted).

"Ordinarily, a search or seizure is unreasonable 'in the absence of individualized suspicion of wrongdoing.'" *United States v. Tello*, 924 F.3d 782, 786 (5th Cir. 2019) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)); *see also Wright*, 57 F.4th at 530 ("A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place." (quoting *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013))).

As reflected in the complaint and the motion to dismiss, each side characterizes the seizure of J.C. as a *Terry* stop, "a special category of Fourth Amendment seizures, in which an officer may briefly detain an individual for further investigation, if the officer has reasonable suspicion the individual is engaged in criminal activity." *Wright*, 57 F.4th at 530 (cleaned up; citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Dunaway v. New York*, 442 U.S. 200, 210 (1979)); *see, e.g.*, Dkt. No. 1, ¶¶ 95-127; Dkt. No. 6 at 18 ("The facts and circumstances Plaintiff alleges justify deputies (including Defendants Britton and White) detaining and handcuffing J.C. This was an

investigatory stop authorized by *Terry* and based on a particularized and objective basis.").

To "review the legality" of *Terry* stops, courts "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (per curiam) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc)).

"The 'touchstone of the Fourth Amendment is reasonableness,' and reasonableness is measured 'in objective terms by examining the totality of the circumstances .... eschew[ing] bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.'" *United States v. Del Angel*, No. 20-20258, 2022 WL 1549479 (5th Cir. May 17, 2022) (per curiam) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

"Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement," while "courts must allow officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Henry*, 37 F.4th at 176-77 (cleaned up).

And, while "[w]hether any particular stop is reasonable varies with the facts on the ground," "'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Emesowum v. Cruz*, 756 F.

App'x 374, 379 (5th Cir. 2018) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983); citation omitted).

The reasonableness of an extended or continued detention based on *Terry* thus turns on "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). And, so, an "investigative detention that 'lasted longer than necessary to effect the purpose of the stop' [is] unlawful." *Emesowum*, 756 F. App'x at 379 (quoting *Johnson v. Thibodaux City*, 887 F.3d 726, 734 (5th Cir. 2018)).

Consequently, "once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion." *United States v. Valdez*, 267 F.3d 395, 398 (5th Cir. 2001). And, so, a person "may not be detained even momentarily without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498.

Under these standards, the Fifth Circuit affirmed a district court's denial of a motion to dismiss a Fourth Amendment unreasonable seizure claim based on qualified immunity where "the duration of [the plaintiff's] detention exceeded the permissible boundaries of a *Terry* stop." *Emesowum*, 756 F. App'x at 379:

> [E]ven if the officers had reasonable suspicion to detain Emesowum, the district court, viewing the facts in the light most favorable to Emesowum, determined that the duration of his detention exceeded the permissible boundaries of a *Terry* stop [where the district court determined] that the officers knew shortly after handcuffing Emesowum that he owned the Mercedes Benz and was not attempting to burglarize it. The officers found the car keys in Emesowum's hand and then asked his advice on how to open it. Once reasonable grounds for suspecting

that Emesowum was burglarizing the car were dispelled, the "purpose of the stop" was completed. Yet, on the facts identified by the district court, the officers kept Emesowum handcuffed in the back of Cruz's police cruiser while they searched for ownership papers, despite knowing "that the vehicle belonged to him." Such continued detention is unreasonable under the Fourth Amendment.

It was clearly established at the time of this incident that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500; *see also Turner*, 848 F.3d at 693-95 (reversing grant of motion to dismiss on qualified immunity grounds where detention amounted to warrantless arrest); *Freeman v. Gore*, 483 F.3d 404, 413-14 (5th Cir. 2007) (affirming denial of summary judgment based on qualified immunity in § 1983 suit for unlawful arrest); *Brigham*, 382 F.3d at 510 (collecting cases holding that continued questioning when "there remained no reasonable suspicion of wrongdoing" unconstitutionally prolonged detentions). At the time of Emesowum's detention, no reasonable officer could have concluded that the Fourth Amendment permitted detaining a person in handcuffs in the back of a police cruiser after the officer's previously reasonable suspicion had been dispelled …. Accordingly, the genuine disputes of fact are sufficient to meet Emesowum's burden to overcome the officers' assertion of qualified immunity on his claim of unlawful detention.

*Id.* at 379-80 (citations modified and omitted).

And, relying on the controlling authority collected by *Emesowum*, another judge in this district denied qualified immunity based on the pleadings after finding that the plaintiff "stated a plausible claim for unreasonable seizure because the well-pled facts indicate [the officer]: (1) detained Plaintiff for longer that was necessary to confirm or dispel his suspicion that Plaintiff was or had been in possession of marijuana and/or possession of drug paraphernalia; and (2) extended Plaintiff's detention without additional reasonable suspicion." *Police v. Navarro Coll.*, No. 3:22-cv-712-E, 2023 WL 3362610, at *9 (N.D. Tex. May 10, 2023).

The court in *Police* then found that,

[w]hile the Fifth Circuit's opinion in *Emesowum* is not itself controlling

precedent, each of the decisions the Fifth Circuit cited in support of its conclusion that the officer in *Emesowum* violated plaintiff's clearly established rights are published opinions and therefore constitute controlling precedent that place the instant "constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

> Plaintiff alleges Arnett "acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's clearly established constitutional rights," including the right to be free from the unreasonable seizure of his person. Based on the facts alleged, the Court concludes Plaintiff has pled facts with sufficient specificity to "defeat a qualified immunity defense." *Backe*, 691 F.3d at 648. When Arnett ordered Plaintiff to accompany Arnett to Plaintiff's dormitory on the College campus, no reasonable officer could have concluded that the Fourth Amendment permitted such a continued detention of Plaintiff – because Arnett's reasonable suspicion of a crime (that Plaintiff was or had been in possession of marijuana and/or drug paraphernalia) had already been dispelled. *See Valdez*, 267 F.3d at 398 (detention became unlawful once suspicion was dispelled); see also *Emesowum*, 756 F. App'x at 379-80 (detention became unlawful after officer uncovered evidence plaintiff owned the car the officer had previously believed plaintiff was attempting to burgle). Accordingly, Plaintiff has adequately pled facts allowing the Court to draw the reasonable inference that not only that Arnett is liable for the conduct alleged but also that Plaintiff can defeat Arnett's defense of qualified immunity. *See Backe*, 691 F.3d at 648.

*Police*, 2023 WL 3362610, at *11.

Similarly, here, Price has alleged that it was unreasonable to detain J.C. once it was dispelled that he was not in possession of the gun and where no additional reasonable suspicion justified an extension of J.C.'s detention.

And, in support of these allegations, set out above, the undersigned finds that Price has "plead[ed] specific facts that both allow" for "the reasonable inference that" Britton and White violated the Fourth Amendment by continuing J.C.'s detention "and that defeat [their associated] qualified immunity defense with equal specificity." *Allen*, 65 F.4th at 744.

In making this finding, the undersigned emphasizes that, as *Emesowum* and

*Police* demonstrate, "[a] plaintiff need not show that the very action in question has previously been held unlawful," because "[t]he test is whether every reasonable official would know that their actions are unconstitutional," and, so, "[a]t the end of the day, [what is absolutely necessary] is fair warning," *Stevenson*, 113 F.4th at 504.

And, as of June 2022, Supreme Court and Fifth Circuit precedent provided fair warning that it was unreasonable to prolong an investigatory detention under *Terry* that was initiated based on the suspicion of contraband (here, a firearm) where that suspicion is dispelled (*i.e.*, where it's plausibly alleged that an investigatory detainee did not possess – and, because the incident report is not part of the pleadings, never possessed – a gun and that officers were told by a witness that an individual who did had left the premises before their arrival) and no additional reasonable suspicion arose to justify extending that detention.

The undersigned also highlights that, while the fair notice "hurdle is even higher when the plaintiff alleges a Fourth Amendment violation," *Henderson v. Harris Cnty., Tex.*, 51 F.4th 125, 132 (5th Cir. 2022), and, so, "[e]specially when evaluating qualified immunity in the Fourth Amendment context, [courts] look for precedent that squarely governs the specific facts at issue," *Perry v. Mendoza*, 83 F.4th 313, 319 (5th Cir. 2023) (cleaned up), this heightened fair notice standard has developed in the context of excessive-force cases that turn on split-second decision-making and therefore applies with less force where the alleged Fourth Amendment violation plays out over a more extended period of time – like the decision to prolong an investigatory detention, *compare Morrow*, 917 F.3d at 876 ("[O]vercoming

qualified immunity is especially difficult in excessive-force cases. This is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.… [E]xcessive-force claims often turn on split-second decisions to use lethal force. That means the law must be *so* clearly established that – in the blink of an eye, in the middle of a high-speed chase – every reasonable officer would know it immediately." (cleaned up)), *with Fairchild v. Coryell Cnty., Tex.*, 40 F.4th 359, 367-68 (5th Cir. 2022) ("The caselaw specificity required to overcome qualified immunity is lacking for the early parts of the fateful encounter.… But a jury's finding that the jailers continued to apply pressure to Page's neck, back, and legs for more than two minutes after she was subdued … would establish a violation of clearly established law." (citations omitted)); *see also Henriquez v. City of Farmers Branch, Tex.*, No. 3:16-cv-868-M-BN, 2022 WL 3127838, at *19 (N.D. Tex. July 8, 2022) ("'[O]bvious' constitutional violations most often involve violations alleged (or shown) to have occurred over longer periods of time, which may allow defendants ample time to reflect on their actions (and their egregiousness). Such violations less often occur – if at all – in excessive force cases turning on split-second decisions.")), *rec. accepted*, 2022 WL 3104844 (N.D. Tex. Aug. 4, 2022).

## IV.    The Court should deny the dismissal of the excessive force claim based on qualified immunity.

After the decision to handcuff J.C., Price alleges that

> J.C. said "hold up" in response … and turned and took two steps in the direction of his younger sister who was sitting watching the encounter to tell her that he was being detained and that the deputies would be taking him home.

Almost simultaneously, as J.C. said, "hold up" and took two steps in the direction of his little sister, Britton grabbed him and tackled him on the concrete ground.

After tackling him on the ground, Defendant Britton held J.C. down on the ground.

Only two seconds after Britton tackled J.C. and held him down on the ground, Defendant Sharrock tased J.C. twice. Below is a screen capture from body worn video showing Britton on top of J.C. while Defendant Sharrock tased J.C. twice.

J.C. was not threatening any officer or other person immediately prior to when Defendant Sharrock tased him twice as J.C. never raised his voice nor made any verbal threats toward Defendant or any other person.

J.C. was not actively resisting arrest prior to when Defendant Sharrock tased him twice as J.C. was on the ground with hands and legs clearly visible as Defendant Britton holding him down on the ground.

Additionally, at no point did the deputies and corporal inform J.C. that he was under arrest.

J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Sharrock tased him twice as J.C. was on the ground with hands clearly visible while Defendant Britton held him down on the ground.

Here, although J.C. had previously failed to immediately comply with the directive that he put his hands behind his back by Britton prior to being tased twice by Defendant Sharrock, a reasonable jury could find the amount of force which Defendant Sharrock exerted to exceeded the need as J.C. was on the ground with hands clearly visible not holding a weapon and curled up in pain from the agony of being tased with Defendant Britton holding him down on the ground.

Two seconds after Defendant Sharrock finished tasing J.C., Defendant Frias tased J.C .and drive stunned him twice. Below is a screen capture from body worn camera footage showing J.C. screaming in agony as Defendant Frias drive stunned him twice and tased him.

J.C. was not threatening any officer or other person immediately prior to when Defendant Frias tased and drive stunned him twice as J.C. never raised his voice nor made any verbal threats toward Defendant or any other person.

J.C. was not actively resisting arrest prior to when Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain with the agony of being tased while Defendant Britton held J.C.'s left arm down and J.C. grasped his chest with his right arm.

J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain

with the agony of being tased while Defendant Britton held his left arm
down and J.C. grasped his chest with his right arm.

Dkt. No. 1, ¶¶ 75-87 (footnote omitted).

A claim "that law enforcement officers have used excessive force – deadly or
not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen
should be analyzed under the Fourth Amendment and its 'reasonableness' standard."
*Graham v. Connor*, 490 U.S. 386, 396 (1989); *accord Garza v. Briones*, 943 F.3d 740,
744 (5th Cir. 2019) ("Excessive-force claims are 'governed by the Fourth Amendment's
"reasonableness" standard.'" (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014))).

To ultimately "prevail on a Section 1983 excessive force claim, a plaintiff must
establish: (1) injury (2) which resulted directly and only from a use of force that was
clearly excessive, and (3) the excessiveness of which was clearly unreasonable."
*Shepherd v. Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) (cleaned up).

"The injury prong requires more than a de minimis injury in most instances."
*Martinez v. City of Rosenberg*, ___ F.4th ____, No. 23-20539, 2024 WL 5063254, at *3
(5th Cir. Dec. 11, 2024) (citing *Buehler v. Dear*, 27 F.4th 969, 982 (5th Cir. 2022)).
And "[a]ny force found to be objectively unreasonable necessarily exceeds the de
minimis threshold." *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (quoting
*Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017)).

And, as the Fifth Circuit has explained,

[e]xcessive-force claims are "necessarily fact-intensive," so we must
"examine the totality of the circumstances to determine whether an
officer's actions were objectively unreasonable." "The intent or
motivation of the officer is irrelevant; the question is whether a
reasonable officer in the same circumstances would have concluded that
a threat existed justifying the particular use of force." We only consider

the facts "knowable to the defendant officers" at the time the officers used force, and we must be "careful to avoid 'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'"

*Roque*, 993 F.3d at 333 (footnotes omitted).

> *Graham* identifies several factors bearing on the reasonableness of force: with "careful attention to the facts and circumstances of each particular case," courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." We consider "not only the need for force, but also the relationship between the need and the amount of force used." Faced with an uncooperative arrestee, officers properly use "measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance."

*Cloud*, 993 F.3d at 384 (citations omitted).

To start this reasonableness inquiry, Price does not allege that Britton violated J.C.'s right to be free from unconstitutionally excessive force. *See, e.g.*, Dkt. No. 1, ¶ 140 ("[E]ven though J.C. had previously turned and two steps when he was tackled by Defendant Britton, Defendants Frias and Sharrock were not justified in their actions after J.C. had been subdued by Defendant Britton taking J.C. to the ground, as J.C. was no longer attempted to resist or evade." (citation omitted)).

So the Court's focus should be on Frias's and Sharrock's actions after "Britton [took] J.C. to the ground." *Id.*

And, in recent cases involving the use of tasers, decided prior to June 2022, "[o]f the factors identified in *Graham*," the Fifth Circuit recognized "the extent of [the suspect's] resistance [as] the most important to analyzing [the officer's] use of his taser." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021); *accord Betts v. Brennan*, 22 F.4th 577, 582-83 (5th Cir. 2022).

Our cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to a taser. Where … the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force. For example, we have held that two officers were reasonable to tase an arrestee because he had "aggressively evaded [their] attempts to apprehend him," and because they did so after the arrestee "continuously failed to comply," other "efforts to subdue [him] were ineffective," and the arrestee had "continued to resist handcuffing" and "kicked an officer after being taken to the ground." *Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016). In that case, we took as further evidence of "measured and ascending" action that "neither officer used [his] taser as the first method to gain [the arrestee's] compliance." *Ibid.*; *see also Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him."). In another case – one not involving a taser but nonetheless relevant – we held that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, because the arrestee "resisted when [the officer] attempted to place handcuffs on him." *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009). Specifically, the arrestee had "pulled his hand back and turned away from the officer," then grappled with him briefly. *Id.* at 216.

By contrast, we have found excessive force when officers tased someone offering only passive resistance or no resistance at all. For example, we held that officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an "off-color joke." *Newman v. Guedry*, 703 F.3d 757, 762-63 (5th Cir. 2012). Under those circumstances, police could not "immediately resort[ ] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763. In another case, we found excessive force when an officer tased someone who did no more than pull his arm out of the officer's grasp, and who was not even suspected of a crime up to that point. *Ramirez*, 716 F.3d at 378; *see also Trammell*, 868 F.3d at 341-42 (arrestee pulling his arm away from officer's grasp did not alone justify two officers' tackling him to the ground). Likewise, we recently found excessive force when officers repeatedly beat and tased a man who "was not suspected of committing any crime, was in the fetal position, and was not actively resisting." *Joseph*, 981 F.3d at 336; *see also id.* at 335 ("If Joseph was not actively resisting, [officers] inflicted force beyond what the Fourth Amendment permits.").

*Cloud*, 993 F.3d at 384-85 (citations modified and footnote omitted); *see also Betts*, 22

F.4th at 583 (observing that "the line between active and passive resistance is sometimes hazy and must be judged in light of the 'necessarily fact-intensive' nature of the inquiry" (citation omitted)).

Considering the allegations of the complaint, set out above, and these established standards, the undersigned finds that Price has "plead[ed] specific facts that both allow" for "the reasonable inference that," by tasing or drive stunning J.C. almost immediately after he was tackled to the ground and held there, with his hands visible, where he was neither threatening the Deputies nor attempting to flee, Frias and Sharrock violated the Fourth Amendment "and that defeat [their associated] qualified immunity defense with equal specificity." *Allen*, 65 F.4th at 744.

For example, the use of a taser that the Fifth Circuit found to be reasonable in *Betts* stands in contrast to the pleadings here:

> "Other factors show Brennan's use of force was reasonable. For instance, he did not tase as a first resort. That is, he did not "immediately resort[ ] to [the taser] ... without attempting to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763; *see also Trammell*, 868 F.3d at 342 ("This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need."). To the contrary, Brennan "properly use[d] 'measured and ascending actions that correspond[ed] to [Betts's] escalating verbal and physical resistance.'" *Cloud*, 993 F.3d at 384 (quoting *Joseph*, 981 F.3d at 332-33). Brennan tried to get Betts to stand behind the truck by invitation, explanation, command, and even by grasping his arm. And Brennan warned Betts more than once that he would be tased if he did not comply with his orders. Only when all those lesser options appeared to have failed did Brennan use his taser.
>
> Furthermore, Brennan tased Betts only once. That was enough to subdue Betts and allow Brennan to handcuff him. At that point, additional force was not necessary and Brennan did not use any (although he did warn Betts that further resistance would be met with another tase). This shows a reasonable "relationship between the need

[for force] and the amount of force used." *Joseph*, 981 F.3d at 332 (citation omitted); *see also Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (citation omitted)); *cf. Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) (per curiam) (finding excessive force where officer "continued to tase [arrestee] repeatedly, even after she was subdued on the ground").

*Betts*, 22 F.4th at 583-84; *see also Salazar v. Molina*, 37 F.4th 278, 284 (5th Cir. 2022) ("When Molina made the split-second decision to deploy his taser, Salazar had just committed a dangerous felony and was unrestrained at night in the open. Because of the preceding high-speed chase, Molina could reasonably be concerned about the sincerity of Salazar's purported surrender. And the totality of the force deployed – a 10-second tasing – was comparatively modest and not grossly disproportionate to the threat Molina could have reasonably perceived.").

## Recommendation

The Court should deny Defendants Iseah White, Antonio Britton, Guadalupe Frias, and Mark Sharrock's motion to dismiss [Dkt. No. 6].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by

reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: December 12, 2024

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE