IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **CHERION PRICE, on behalf of her minor son, J.C.,** | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. **3:24-CV-1387-L** |
| **IESAH WHITE; ANTONIO BRITTON; GUADALUPE FRIAS; and MARK SHARROCK,** | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

On December 13, 2024, the Findings, Conclusions and Recommendation of the United States Magistrate Judge ("Report") (Doc. 17) was entered, recommending that the court deny Defendants' Motion to Dismiss Plaintiff's Original Complaint ("Motion to Dismiss") (Doc. 6), in which Defendants seek dismissal of Plaintiff's excessive force and unlawful detention claims based on their assertion of qualified immunity. Defendants filed objections to the Report ("Objections") (Doc. 11). On June 5, 2026, the undersigned recommitted this matter to the magistrate judge for further consideration (Doc. 16). On August 25, 2026, the Findings, Conclusions and Recommendation of the United States Magistrate Judge ("Supplemental Report") (Doc. 22) was entered, recommending the court deny Defendants' Motion to Dismiss for the reasons stated in the Report as supplemented. On September 8, 2026, Defendants filed objections to the Supplemental Report ("Objections to Supplemental Report") (Doc. 24).

After considering the Report, Supplemental Report, pleadings, record, applicable law, and legal briefing, and for the reasons that follow, the court **overrules** Defendants' Objections (Doc. 11), **overrules** Defendants' Objections to Supplemental Report (Doc. 24), and **accepts** the

magistrate judge's findings and conclusions, *as modified below*, as its own. Accordingly, Defendants' Motion to Dismiss (Doc. 6) is **denied**.

## I. Background

On June 6, 2024, Plaintiff Cherion Price, on behalf of her minor son, J.C., filed this civil action pursuant to 42 U.S.C. § 1983 against Defendants Iseah White, Antonio Britton, Guadalupe Frias, and Mark Sharrock, peace officers employed by Kaufman County Constable Precinct No. 2 (collectively, "Defendants"). *See generally* Compl. (Doc. 1). Specifically, Plaintiff, on behalf of J.C., asserts claims against Defendant White and Defendant Britton for illegal detention (*id.* ¶¶ 95-127, 169) and claims against Defendant Sharrock and Defendant Frias for excessive force (*id.* ¶¶ 128-163, 169). Plaintiff, on behalf of J.C., seeks actual, punitive, and exemplary damages, as well as reasonable attorney's fees and costs of suit. *Id.* ¶¶ 170-174.[1]

### A. Factual Allegations

The well-pleaded facts as alleged in the Complaint are as follows.

#### *1. Allegations Concerning Initial Encounter and Detention*

On June 6, 2022, J.C., a sixteen-year-old boy, chaperoned his godsister and younger sister while visiting a neighborhood pool with his friend. *Id.* ¶ 8. Security guard Shana Cowen "approached J.C. after receiving a report about a male at the pool with a gun." *Id.* ¶ 9. "J.C. informed Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go." *Id.* ¶ 10 (underline in original).

[1] Although Cherion Price brings this case on behalf of her minor son, J.C., who was sixteen years old at the time of the events alleged in the Complaint, more than four years have passed since the alleged events. As J.C. is no longer a minor, the court **directs** Plaintiff to explain why the caption should not be changed to reflect that J.C. is the correct Plaintiff and is bringing suit on his own behalf.

Defendant Iesah White ("Defendant White") and Deputy Snow, who is not named as a Defendant, arrived at the pool after receiving a report from Cowen about a male at a pool with a gun. *Id.* ¶ 11. Cowen informed Defendant White and Deputy Snow that "a tall, brown male that she had no idea if he was underage, eighteen, or nineteen years old put a gun away." *Id.* ¶ 12. Deputy Snow asked if the male had the gun out since he had put it away, and Cowen responded "that the male didn't have the gun out, but he had it in his pants." *Id.* ¶¶ 13-14.

Defendant White and Deputy Snow walked up to the pool and signaled for J.C. to step out of the pool, and he complied. *Id.* ¶¶ 15-16. Deputy Snow asked J.C. his age, and J.C. answered that he was sixteen years old. *Id.* ¶¶ 17-18. Deputy Snow asked J.C. if he had a firearm they needed to know about, and J.C. respectfully responded, "no sir." *Id.* ¶¶ 19-20. Deputy Snow asked J.C. if he was sure he did not have a firearm and, if he did have a backpack, where it was located. *Id.* ¶ 21. Defendant White asked what kind of backpack it was, and J.C. answered that "he [referring to his friend that was previously at the pool] just left so I don't know. He probably took it home. He's gone." *Id.* ¶¶ 22-23. Defendant White asked J.C. if he had a backpack there at the pool, and J.C. shook his head "no," and said that he was not wearing a backpack. *Id.* ¶¶ 24-25. Defendant White responded, "You ain't be wearing a backpack? All of y'all wear backpacks." *Id.* ¶ 26. J.C. responded that he does not carry a backpack and does not need a backpack. *Id.* ¶ 27. Defendant White asked if the male at the pool earlier was his brother. J.C. responded that it was his little brother, but he has another brother. *Id.* ¶¶ 28-29. Defendant White responded, "y'all look alike that's why I know that was your brother and y'all both got your twist in your hair." *Id.* ¶ 30.

Defendant Britton and Defendant Sharrock arrived at the scene and joined Defendant White, as the three of them stood over J.C., who was seated, and continued questioning him. *Id.* ¶¶ 31-32. Defendant White told Defendants Britton and Sharrock, "yeah, he talked to him then

said he'd be right back. He left." *Id.* ¶ 33. Defendant White told Defendants Britton and Sharrock that J.C. "was the guy but did not have a backpack." *Id.* ¶ 34. Defendant Britton asked J.C. if anyone had spoken to him about having a gun. "J.C. answered that the pool lady [Ms. Cowen] asked if he had a gun because someone said they saw him with a firearm." *Id.* ¶¶ 35-36. After Defendant Britton asked if he had a gun and if he ever had one, J.C. again stated "no." *Id.* ¶¶ 37-38. Defendant Sharrock questioned, "Did you pick up the backpack? J.C. shook his head 'no.'" *Id.* ¶¶ 39-40. J.C. "again informed the deputies that his brother had a backpack, but he had already left." *Id.* ¶ 42.

J.C. led the deputies to the backpack left behind by his friend and when requested, gave the deputies permission to search the backpack. *Id.* ¶¶ 43-45. Defendant Britton searched the backpack for a gun while Defendant White and Defendant Sharrock observed, but Defendant Britton did not find a gun. *Id.* ¶¶ 46-47. Defendant Sharrock went to check the bathroom since witnesses had stated the male that was previously at the pool seen with the gun went into the bathroom. *Id.* ¶ 50.

Defendant Frias then arrived at the scene. *Id.* ¶ 51. Defendant Britton asked J.C. "if he had his driver's license or school identification on him," while Defendant White asked J.C. his first and last name. J.C. provided his name and date of birth as requested and informed Defendant White he did not have identification with him. *Id.* ¶¶ 52-53.

Defendant White went to search the bathrooms for the gun. A female witness came in the bathroom, and Defendant White asked if she saw the gun and, if so, what happened to it. *Id.* ¶¶ 55-56. The female witness stated, "they jumped the fence." *Id.* ¶ 57. Defendant White informed Defendant Britton and Defendant Frias that the weapon was gone. *Id.* ¶ 58. Defendant Frias stated, "if there was one." *Id.* ¶ 59. Defendant White stated, "it was one." *Id.* ¶ 60. When Defendant Frias

asked how she knew this, Defendant White informed him that the caller reported, "the brother that left jumped the fence and took off." *Id.* ¶ 61. Plaintiff alleges that, at this juncture:

> There was no justification to continue detaining J.C. as the deputies had been informed by witnesses at the scene that a male juvenile who was accompanying J.C. had left the scene with a weapon, the deputies had searched and had not located a gun, and J.C. had not committed any crimes justifying his illegal detention.

*Id.* (providing screenshot of a portion of the incident report acknowledging deputies had this information but still continued to detain J.C.).

The deputies "continued detaining J.C. and interrogating J.C., despite the fact that there was nothing justifying his continued illegal detention." *Id.* ¶ 62. Defendant Frias stated, "let's find out where he lives," and Defendant White asked J.C. for his address, to which J.C. responded that he did not know the name of the street as his family had just moved, but the street was about five streets down from their current location." *Id.* ¶¶ 63-65.

Defendant Frias told Defendants Britton and White "to take J.C. home, check the brother out, and 'He's with you. Cuffs or no cuffs I don't care but he's with you till we find the gun.'" *Id.* ¶ 66. J.C. again informed the deputies that there was no gun. *Id.* ¶ 67. "[D]espite having information that J.C. had not committed any crimes as he did not have a gun and was not described by witnesses as being the person with a gun, Defendant Frias instructed Defendants Britton and White to detain J.C." *Id.* ¶ 69; *see also id.* ¶ 68 (providing screenshot of a portion of the Incident Report where Defendant Frias states that Defendant White "advised me that a witness advised her that the subject has a brother who retrieved the gun and jumped the back fence area and location prior to our arrival"; that "[d]ue to the information that was gathered and the subject that was being questioned was 16 years of age I directed [Defendants] White and Britton to take custody of the subject being questioned"; and that "we would be taking home to locate his brother and release the subject to his parents after informing the parent of the nature of the call.")

Defendant Britton and Defendant White "further detained J.C. by informing him he was detained and requesting that he place his hands behind his back." *Id.* ¶ 71. "J.C. spoke calmly with the deputies for approximately fourteen minutes answering all of their questions before he was instructed to place his hands behind his back." *Id.* ¶ 72. Defendant Britton informed J.C. that "they were going to take him to his house to find out where he was staying." *Id.* ¶ 73. Defendant Britton and Defendant White "further detained J.C.by informing him he was detained and requesting that he place his hands behind his back." *Id.* ¶ 74.

***2. Allegations Regarding Excessive Force***

J.C., upon being told to place his hands behind his back and that he was being detained, said "'holdup' in response to the illegal detention and turned and took two steps in the direction of his younger sister who was sitting watching the encounter to tell her that he was being detained and that the deputies would be taking him home." *Id.* ¶ 75. Almost simultaneously, Defendant Britton grabbed him and tackled him on the concrete ground. *Id.* ¶ 76. After tackling him, Defendant Britton held J.C. down on the ground. *Id.* ¶77.

Only two seconds later, Defendant Sharrock tased J.C. twice. *Id.* ¶ 78. "J.C. was not threatening any officer or other person immediately prior to when Defendant Sharrock tased him twice as J.C. never raised his voice nor made any verbal threats toward Defendant Sharrock or any other person." *Id.* ¶ 79. "J.C. was not actively resisting arrest prior to when Defendant Sharrock tased him twice as J.C. was on the ground with hands and legs clearly visible as Defendant Britton [was] holding him down on the ground." *Id.* ¶ 80. Further, "J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Sharrock tased him twice as J.C. was on the ground with hands clearly visible while Defendant Britton held him down on the ground. *Id.* ¶ 82.

"Two seconds after Defendant Sharrock finished tasing J.C., Defendant Frias tased J.C and drive stunned him twice." *Id.* ¶ 84. "J.C. was not threatening any officer or other person immediately prior to when Defendant Frias tased and drive stunned him twice as J.C. never raised his voice []or made any verbal threats toward [him] or any other person." *Id.* ¶ 85. J.C. was not actively resisting arrest prior to when Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain with the agony of being tased while Defendant Britton held J.C.'s left arm down and J.C. grasped his chest with his right arm." *Id.* ¶ 86. "J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Frias tased and drive stunned him twice as J.C. was on the ground curled up in pain with the agony of being tased while Defendant Britton held his left arm down and J.C. grasped his chest with his right arm." *Id.* ¶ 87.

**B. Procedural History**

On July 8, 2024, Defendants moved to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting qualified immunity. On July 29, 2024, Plaintiff filed a response brief in opposition to Defendants' Motion to Dismiss (Doc. 7). On July 30, 2024, the court referred Defendants' Motion to Dismiss to the United States magistrate judge for hearing, if necessary, and for recommendation pursuant to 28 U.S.C. § 636(b). Order of Referral (Doc. 9). On August 12, 2024, Defendants filed a reply (Doc. 9). On December 13, 2024, the magistrate judge issued his Report (Doc. 10), recommending the court deny Defendants' Motion to Dismiss. Defendants filed Objections (Doc. 11), Plaintiff filed a response to the Objections (Doc. 12), and Defendants, without leave of court, filed a reply (Doc. 13).

On June 5, 2026, rather than rule on Defendants' Objections, the undersigned recommitted Defendants' Motion to Dismiss to the magistrate judge for further consideration and issuance of

amended or supplemental findings, conclusions, and recommendations. *Price v. White*, 2026 WL 1651455 (N.D. Tex. June 5, 2026) (hereinafter, "*Price I*"). Following limited briefing, on August 25, 2026, the magistrate judge issued his Supplemental Report (Doc. 22), in which he recommended the court deny Defendants' Motion to Dismiss for the reasons stated in the Report as supplemented. On September 8, 2026, Defendants filed their Objections to Supplemental Report (Doc. 24), and on September 18, 2026, Plaintiff filed a response (Doc. 27).

## II. Legal Standards

### A. Standard for Reviewing a Magistrate Judge's Report

When a party files timely written objections to a magistrate judge's report, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). As to any portions of the magistrate judge's report to which there is no objection, and when no objection to the report is filed at all, the district judge applies a "clearly erroneous" and "contrary to law" standard of review. *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).

### B. Motion to Dismiss – Fed. R. Civ. P. 12(b)(6)

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Id.* at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a

plaintiff's complaint and not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way:

> A motion to dismiss for failure to state a claim concerns the formal sufficiency of the statement of the claim for relief, not a lawsuit's merits. So when reviewing such a motion, we assume that the facts the complaint alleges are true and view those facts in the light most favorable to the plaintiff. The complaint survives if it contains sufficient factual matter . . . to state a claim to relief that is plausible on its face.

*Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020) (citations and quotation marks omitted). Accordingly, the denial of a 12(b)(6) motion has no bearing as to whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge.

### C. Qualified Immunity

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant official must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Defendants have asserted this defense in Defendants' Motion to Dismiss.

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme Court initially set forth a mandatory two-part inquiry for determining whether a government official was entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under *Saucier*, a court must determine first whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right. If the record sets forth or establishes no violation, no further inquiry is necessary. On the other hand, if the plaintiff sufficiently pleads or establishes that a violation could be made out, the court must determine whether the right at issue was clearly established at the time of the government official's alleged misconduct. *Id.* The Court relaxed this mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223 (2009), and stated, "[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory," and judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The second prong of the test "is better understood as two separate inquiries: whether the allegedly violated constitutional right[] [was] clearly established at the time of the incident; and if so, whether the conduct of the defendant[]

[official] was objectively unreasonable in light of that then clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (internal quotation marks and citations omitted)); *see also Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999); *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).

Ordinarily, one who pleads an affirmative defense must establish his or her entitlement to such defense. In the context of qualified immunity, however, this burden varies from the norm. In this circuit, the rule is as follows:

> Where . . . [a] defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his or her actions [what he or she is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640; *Stefanoff v. Hays Cnty.*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d at 871.

In *Anderson*, 483 U.S. at 641, the Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official could have believed that

his or her conduct was lawful in light of clearly established law and the information possessed by him or her. If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v. Smith*, 117 F.3d at 882 (emphasis in original and citation omitted); and *Stefanoff v. Hays Cnty.*, 154 F.3d at 525. Stated differently and more rigidly, while the law does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted). The Court reaffirmed the parameters of "clearly established" law in 2018. *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Although 'this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (alteration and internal quotation marks omitted in *Kisela*)).

In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts to not define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of particular conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

Notably, "when, as here, a qualified immunity defense is asserted in an answer or motion to dismiss, 'the district court must'—as always—do no more than determine whether the plaintiff has 'file[d] a short and plain statement of his complaint, a statement that rests on more than conclusions alone.'" *Anderson v. Valdez*, 845 F.3d 580, 589-90 (5th Cir. 2016) (quoting *Schultea v. Wood*, 47 F.3d 1433 (5th Cir. 1995)).

**III. The Magistrate Judge's Report**

In his thirty-nine-page Report, the magistrate judge recommended that the court deny Defendants' Motion to Dismiss. Report 38. To evaluate Defendants' Motion to Dismiss and in support of his recommendation, the magistrate judge first addressed Defendants' contention that the court must consider the content of the incident report attached to Defendants' Motion to Dismiss (*see* Doc. 6-1), a report that Plaintiff references at various points in the Complaint. Report 12. The magistrate judge concluded that the incident report attached to Defendants' Motion to Dismiss should not be considered in ruling on Defendants' Motion to Dismiss because, among other things, although some portions of the incident report are referenced in Plaintiff's pleadings, the incident report is not necessary to prove Plaintiff's claims, and Plaintiff's pleadings dispute the statements in the incident report regarding J.C.'s possession of a gun, which is a material issue.

Report 12-21. The magistrate judge also recommended that the court decline Defendants' alternative request that it take judicial notice of the incident report as a governmental record. Report 22 ("The incident report is akin to a witness statement and thus is [ ] a source of information that [may] reasonably be questioned, as witnesses are routinely questioned and challenged by the discovery process through depositions and requests for documents that [can] contradict witness testimony.") (cleaned up) (citation omitted).

Next, the magistrate judge recommended that the court deny Defendants' Motion to Dismiss based on qualified immunity with respect to Plaintiff's unlawful detention claim. Report 22-32. Among other reasons, he concluded that Defendants are not entitled to dismissal of Plaintiff's unlawful detention claim based on qualified immunity because Plaintiff alleges that there was no justification for J.C.'s further detention (*Terry* stop)[2] after he told Defendants he did not possess a gun and Defendants confirmed this, and J.C.'s continued detention was unreasonable and violated his Fourth Amendment rights, as there was no additional reasonable suspicion to justify prolonging his detention. Report 22-32. In addition, the magistrate judge found:

> [A]s of June 2022, Supreme Court and Fifth Circuit precedent provided fair warning that it was unreasonable to prolong an investigatory detention under *Terry* that was initiated based on the suspicion of contraband (here, a firearm) where that suspicion is dispelled (i.e., where it's plausibly alleged that an investigatory detainee did not possess—and, because the incident report is not part of the pleadings, never possessed—a gun and that officers were told by a witness that an individual who did had left the premises before their arrival) and no additional reasonable suspicion arose to justify extending that detention.

Report 31.

Finally, the magistrate judge recommended that the court deny Defendants' Motion to Dismiss based on qualified immunity with respect to Plaintiff's excessive force claim. Report 32-

[2] *See Terry v. Ohio*, 392 U.S. 1, 9 (1968).

38. After providing a thorough analysis of the *Graham* factors and recent Fifth Circuit cases decided prior to June 2022 involving claims of excessive force based on the use of tasers (Report 32-38), the magistrate judge concluded that:

> Considering the allegations of the complaint, set out above, and these established standards, the undersigned finds that [Plaintiff] has "plead[ed] specific facts that both allow" for "the reasonable inference that," by tasing or drive stunning J.C. almost immediately after he was tackled to the ground and held there, with his hands visible, where he was neither threatening [Defendants] nor attempting to flee, [Defendants] Frias and Sharrock violated the Fourth Amendment "and that defeat[ed] [their associated] qualified immunity defense with equal specificity."

Report 37 (quoting *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023)). Although the magistrate judge cites to *Allen*, a case decided after the incident alleged in the Complaint, other Fifth Circuit cases decided prior to June 6, 2022, make it unequivocally clear that this was the standard prior to the incident. *See, e.g., Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013); *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

Defendants filed objections to the Report (Doc. 11), to which Plaintiff filed a response. Thereafter, Defendants filed a reply (Doc. 13).[3]

## IV. Discussion

Defendants move to dismiss Plaintiff's claims against them on the basis of qualified immunity. Prior to reaching Defendants' Objections to the magistrate judge's Report, the court must address two preliminary matters that inform the remainder of its analysis.

[3] Federal Rule of Civil Procedure 72(b)(2) expressly allows a party to file a response to objections but does not contemplate a reply. Fed. R. Civ. P. 72(b)(2). Local Civil Rule 72.2 and the court's Order of Reference (Doc. 8) do not permit a party to file a reply to another party's response to objections. Defendants' reply (Doc. 13) was filed in violation of Local Civil Rule 72.2 and the court's Order of Reference (Doc. 8). Defendants also filed their reply without first seeking and obtaining leave of court as required by this district's Local Civil Rules and the undersigned's Order of Reference (Doc. 8). *Id.* Accordingly, the court will not consider the reply. Even if the court considers the reply, it in no way advances Defendants' arguments, as it is largely redundant of their opening brief.

**A. Preliminary Matters**

***1. Consideration of the Incident Report***

In support of their Motion to Dismiss, Defendants attach as an exhibit an incident report (Doc. 6-1) and note that in the Complaint, "Plaintiff provides screenshots of selected portions of the incident report" and "expressly incorporates [the report] into her complaint." Defs.' Mot. Dismiss 16. Defendants rely heavily on the contents of the incident report to support their arguments that they are entitled to dismissal of Plaintiff's Fourth Amended claims based on qualified immunity. *See* Defs.' Mot. Dismiss, *passim*.

Generally, in considering a motion to dismiss under Rule 12(b)(6), the court "must limit itself to the contents of the pleadings, including attachments thereto." *Collins*, 224 F.3d at 498. If the court is presented with matters outside the pleadings and does not exclude them, "the motion must be treated as one for summary judgment [and] . . . [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Fifth Circuit, however, has recognized "one limited exception" to this rule. *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir.2003). Under that exception, "'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'" *Collins*, 224 F.3d at 498-99 (quoting *Venture Assocs. Corp.*, 987 F.2d at 431).

As previously stated, the magistrate judge concluded that the incident report should not be considered in ruling on Defendants' Motion to Dismiss because, among other things, although some portions of the incident report are referenced in Plaintiff's pleadings, the incident report is not necessary to determine whether Plaintiff has sufficiently pleaded allegations to defeat a motion

to dismiss, and Plaintiff's pleadings dispute the statements in the incident report regarding J.C.'s possession of a gun, which is a material issue. Report 12-21. The magistrate judge also noted that "[u]nlike a breach of contract case, in which the contract is itself a fact that the plaintiff must prove, the incident report is merely evidence – evidence that Price need not rely on to prove her claims." Report 18 (cleaned up) (internal citation omitted).

In their Objections, Defendants contend that the magistrate judge erred in recommending that the court not consider the entire incident report as part of the pleadings in ruling on Defendants' Motion to Dismiss. Defs.' Obj. 1-3. According to Defendants, and notwithstanding Plaintiff's allegations to the contrary, the incident report supports their argument that they had reasonable suspicion to believe that J.C. possessed the gun at issue before they arrived at the scene based on what the security guard allegedly told them:

> Plaintiff omits from the incident report that when "Deputies made contact with [Shana Cowen] the pool security guard . . . **[the security guard had] confirmed with the male, later identified as [J.C.] that he did have a gun** and advised [J.C.] that no guns were allowed at the property." Doc. 6-1, at 4. Thus, "as to these material facts, there is a genuine conflict between the allegations and what the incident report states." Doc. 10, at 17. **What the security guard told officers is central to Plaintiff's claim. It establishes that the Defendants had reasonable suspicion to continue the detention of J.C.** The Recommendation's conclusion that a video of an officer speaking with the pool's security guard should be admitted, but the after-the-fact incident report should not be admitted is incorrect. Plaintiff has incorporated the incident report into her pleadings and, therefore, the whole incident report should be admitted. Defendants object to the recommendation to disregard the parts of the incident report not referenced in Plaintiff's complaint.

Defs.' Obj. 2-3 (emphasis added).

Although Plaintiff references the incident report in the Complaint (*see* Compl. ¶¶ 61, 68), the court agrees with the magistrate judge's analysis and conclusion that the incident report is not central to Plaintiff's claims. Instead, the incident report is much more central to Defendants' defenses. *See Scanlan*, 343 F.3d at 536-37 (discussing *Collins*, 224 F.3d at 498-99). In *Scanlan*,

the Fifth Circuit concluded that the district court erred in considering a report referenced in the plaintiffs' pleadings because the plaintiffs did not accept the report that was created by the defendants, and, while insightful, the report was not central to the plaintiffs' claims; rather, it was "much more central" to the defendant's defenses. *Id.* at 536-37. In this case, Plaintiff does not accept all that is in the incident report.

The incident report here was created by one of the Defendants, specifically Defendant White, and Plaintiff disputes the portion(s) of the incident report upon which Defendants rely to buttress their argument that they are entitled to dismissal based on qualified immunity. *See Scanlan*, 343 F.3d at 537 (noting that the report relied on by the defendants in support of their motion to dismiss was "essentially a defendant-created report," the contents of which were not accepted as true by the plaintiffs). The magistrate judge, therefore, correctly determined that, *at the pleadings stage*, the court applies a different standard to the contents of an after-the-fact police incident report that are rejected by the plaintiff's pleadings than it would to evidence such as a video that contemporaneously captured the incident. Report 19 (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 & n.9 (5th Cir. 2018) (Peña's "characterization"—"that she was not suspected of any crime when she fled"—"is belied by the police reports [incorporated into her complaint], but on a motion to dismiss, Peña's well-pleaded factual allegations enjoy a presumption of truth" where the "complaint expressly rejects those elements of the police report that conflict with her account. Hence, for purposes of Rule 12(b)(6), we presume only that the officers made the assertions contained in the report, not that those assertions are in fact truthful.")) (citations omitted); *cf. Armstrong v. Ashley*, 60 F.4th 262, 272 n.10 (5th Cir. 2023) ("This police report was attached to the Law Enforcement Defendants' Rule 12(c) motion as an exhibit. Because this report is central to the allegations in the Complaint and Reply, this court may consider it,"

because "[t]his is not a case like *Peña v. City of Rio Grande City*, where the plaintiff's 'complaint expressly reject[ed] those elements of the police report that conflict[ed] with her account.'" (quoting *Peña*, 879 F.3d at 620 n.9)).

Thus, although Defendants attached the entire incident report to their Motion to Dismiss (Doc. 6-1), consideration of the report is not appropriate here in resolving their Motion to Dismiss under Rule 12(b)(6) because it is not the equivalent of a video, and the court must construe the well-pleaded factual allegations in Plaintiff's Complaint as true and in the light most favorable to Plaintiff. *See id.*; *see also Scanlan*, 343 F.3d at 537 ("[T]he district court's first error was going outside the plaintiffs' complaints and considering the Final Report. Even if the Final Report fell under the *Collins* exception, the district court failed to construe the plaintiffs' factual allegations in the light most favorable to the plaintiffs.").

Further, with respect to the incident report, Defendants misapprehend its importance at the pleadings stage. Defendants rely primarily on two cases that are critical to the court's analysis regarding the incident report. *Scott v. Harris,* 550 U.S. 372 (2007), and *Harmon v. City of Arlington, Texas,* 16 F.4th 1159 (5th Cir. 2021). Each of these cases involves a videotape of the incident that gave rise to the respective lawsuit. *Scott* is a case that deals with a motion for summary judgment, and *Harmon* is one that deals with a motion to dismiss. In *Scott,* the Court held, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380. In *Scott,* the videotape "blatantly contradicted" the version of facts presented by the plaintiff in responding to a motion for summary judgment. *Id.* at 380-81.

In *Harmon,* the video recordings were included as part of the pleadings. 16 F.4th at 1163. Likewise, in *Harmon,* the video recording blatantly contradicted the plaintiff's version of the facts. By contrast, the incident report in this case does not "blatantly contradict" or "utterly discredit" Plaintiff's versions of the facts as set forth in Plaintiff's Complaint. Moreover, this court cannot equate an after-the-fact incident report with a contemporaneous videotape. A video recorder records events *as they occur,* while the after-the-fact incident report, in this case, is a document created later to reflect Defendants' account of what happened during the detention of Plaintiff's then-minor son. Bluntly stated, as a video recorder records events as they are occurring, it is much more accurate than a later-created incident report. The incident report, in this case, is an "after-the-fact" document that reflects the officers' version of what occurred. In addition to the fact that Plaintiff questions the accuracy of those portions of the incident report upon which Defendants rely in their Motion to Dismiss, the court questions the accuracy of the incident report, as it does not even include the correct date of the incident. *See* Doc. 6-1 at 1 (listing date of incident as 06/06/2023, which is a full year after the incident allegedly occurred).

The court reads *Harmon* to hold that if there is a videotape or other evidence in the record that shows the events of a law-enforcement encounter with a person and that particular video recording "blatantly contradicts" or "utterly discredits" what a plaintiff has pleaded as facts in the Complaint, the court is to disregard what a plaintiff has pleaded to defeat such motion. Here, no video recording or anything else in the record has been provided to the court as part of the pleadings that "blatantly contradicts" or "utterly discredits" what Plaintiff has pleaded as facts in the Complaint.

The court also notes that a majority of the cases relied on by Defendants involved summary judgment motions, not motions to dismiss, and are, therefore, distinguishable because a different standard applies at the summary judgment-stage of litigation. Additionally, Defendants have not requested that their Motion to Dismiss be converted into one for summary judgment, and the court would have declined any such request even if it had been made. *See Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022) ("Where public officials assert qualified immunity in a motion to dismiss, a district court must rule on the motion. It may not permit discovery against the immunity-asserting defendants before it rules on their defense.").

Finally, Defendants do not object to the magistrate judge's recommendation that the court decline Defendants' alternative request that it take judicial notice of the incident report as a governmental record. *See* Report 22. The court determines that the magistrate judge's recommendation to deny Defendants' request that it take judicial notice of the incident report is not clearly erroneous or contrary to law.

For these reasons, as well as the reasons set forth by the magistrate judge (*see* Report 12-22), the court **overrules** Defendants' objection to the magistrate judge's recommendation that, in analyzing Defendants' Motion to Dismiss, the court not consider the incident report attached to Defendants' Motion to Dismiss as part of the pleadings.

***2. The Effect of Barnes v. Felix, if any, on the Magistrate Judge's Findings, Conclusions, and Recommendations***

On June 5, 2026, the undersigned recommitted this matter to the magistrate judge to, among other things, consider the impact, if any, of the Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025), which the Supreme Court decided after the magistrate judge issued his Report. *Price I*, 2026 WL 1651455, at *1-5. In *Barnes*, the Supreme Court rejected the Fifth Circuit's so-called moment-of-threat rule, under which a court "looks only to the circumstances existing at the

precise time an officer perceived the threat inducing him to shoot." 605 U.S. at 76. That approach, the Supreme Court held, "improperly narrow[s] the requisite Fourth Amendment analysis." *Id.* The Supreme Court explained: "To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment." *Id. See also id.* at 83 ("[A] court cannot . . . 'narrow' the totality-of-the circumstances inquiry, to focus on only on a single moment. It must look too, in . . . all excessive-force cases, at any relevant events coming before.").

The magistrate judge ordered the parties to file briefing limited to addressing "Judge Lindsay's June 5 memorandum opinion and order." Order Requiring Limited Briefing 3 (Doc. 17). After receipt of the parties briefing, the magistrate judge issued his Supplemental Report.

Upon further examination of *Barnes* and prior applicable case law, the court determines that *Barnes* is not of any assistance in analyzing whether qualified immunity is appropriate with respect to Plaintiffs' excessive force claims against Defendants Sharrock and Frias. This is so because previous authority makes abundantly clear that a court is required to consider "whether the totality of the circumstances justified a particular sort of . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *see also County of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427-28 (2017) ("The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" (quoting *Garner*, 471 U.S. at 8-9) (ellipses in original)). As noted in *Barnes*, the "moment-of-threat rule applied in the courts below prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances." *Barnes*, 605 U.S. at 81.

For these reasons, the court determines that *Barnes* adds nothing to its analysis, and it has not taken into account or relied on the magistrate judge's Supplemental Report insofar as he

addresses *Barnes*. In addition, the court **overrules as moot** those portions of Defendants' Objections to Supplemental Report (Doc. 24) that pertain to the magistrate judge's assessment of *Barnes*.

Second, Defendants contend the magistrate judge "erred in determining that the 'totality of the circumstances' was to be viewed from the perspective of Plaintiff; qualified immunity requires it to be viewed from the perspective of the officers." Defs.' Obj. Suppl. Report 7 (citation omitted). Defendants mischaracterize the Supplemental Report. The portion to which they object is a quote from Plaintiff's response brief. *See* Suppl. Report 6 (quoting Doc. 21 at 1-2).

Defendants are correct that the "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This does not alter that "[i]n reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *May v. City of Arlington, Texas*, 398 F. Supp. 3d 68, 76-77 (N.D. Tex. 2019) (citing *Sonnier*, 509 F.3d at 675). Here, Defendants have failed to persuade the court that the magistrate judge misapplied the controlling legal standard. For these reasons, the court **overrules** Defendants' third objection to the Supplemental Report.

The remainder of Defendants' Objections to the Supplemental Report merely repackage in a different box their prior Objections to the Report. The court declines to consider these objections, as it is already considering them in the context of Defendants' Objections to the Report. In addition, as the remaining objections are directed at the Report, and not the Supplemental Report, they are untimely and will not be considered. *See* 28 U.S.C. § 636(b)(1) ("Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."); *see also* Fed. R. Civ. P. 72(b) (same).

### B. Plaintiff's Unlawful Detention Claims Against Defendants White and Britton

As previously explained, the magistrate judge recommended that the court deny Defendants' Motion to Dismiss based on qualified immunity with respect to Plaintiff's unlawful detention claim against Defendants White and Britton. Report 22-32. Among other reasons, he concluded that these Defendants are not entitled to dismissal of Plaintiff's unlawful detention claim based on qualified immunity because, viewing all well-pleaded facts alleged in the Complaint as true (1) Plaintiff alleges that there was no justification for J.C.'s further detention (*Terry* stop) after he told Defendants he did not possess a gun and Defendants confirmed this, and (2) J.C.'s continued detention was unreasonable and violated his Fourth Amendment rights, as there was no additional reasonable suspicion to justify prolonging his detention. Report 22-32. In addition, the magistrate judge found that,

> [A]s of June 2022, Supreme Court and Fifth Circuit precedent provided fair warning that it was unreasonable to prolong an investigatory detention under *Terry* that was initiated based on the suspicion of contraband (here, a firearm) where that suspicion is dispelled (i.e., where it's plausibly alleged that an investigatory detainee did not possess—and, because the incident report is not part of the pleadings, never possessed—a gun and that officers were told by a witness that an individual who did had left the premises before their arrival) and no additional reasonable suspicion arose to justify extending that detention.

Report 31.

Defendants Britton and White object to the Report. First, they maintain that Plaintiff has not sufficiently pleaded facts that, if proved, would show that the *Terry* stop of J.C. lasted longer than necessary. According to Defendants Britton and White:

> Defendants Britton and White had additional articulable, reasonable suspicion. They were intending to extend the investigation for the brief purpose of taking J.C. home to discover the whereabouts of the gun that J.C.'s "brother" had left the pool with. Doc. 6-1, at 7. Defendants Britton and White informed J.C. "he was being detained and request[ed] that he place his hands behind his back." Doc. 1, at ¶ 73. This is reasonably related to the scope of the circumstances which justified the interference in the first place.

Defs.' Obj. 5. No reasonable person would view the officers' instructions as a "request." When a uniformed law enforcement officer armed with a badge, firearm, handcuffs, a taser, and the authority of the state tells a person to place his or her hands behind his or her back, it is an order—plain and simple.

Second, Defendants contend that, at the time of the events alleged in the Complaint, it was not "clearly established" that a "14-minute detention," as alleged in the Complaint, would violate the Fourth Amendment." Defs.' Obj. 6.

The court **overrules** Defendants' objections for essentially the reasons set forth in the Report. In addition, the court **overrules** Defendants' objection concerning the length of the *Terry* stop for the following reasons, first set forth by the court in its decision recommitting the matter to the magistrate judge. *See Price I*, 2026 WL 1651455, at *1-5.[4] Regarding the length of the *Terry* stop, the magistrate judge focused on Plaintiff's allegation that "it was unreasonable to detain J.C. once it was dispelled that he was not in possession of the gun and whe[n] no additional reasonable suspicion justified an extension of [his] detention." Report 30. In their objections, Defendants Britton and White assert that J.C.'s continued detention was justified, even after confirming that he was not currently in possession of the gun, because: (1) they had reasonable suspicion that he

[4] Of note, notwithstanding that, following recommittal, the magistrate judge ordered Defendants to file "a brief of no more than five pages to address Judge Lindsay's June 5 memorandum opinion and order," *see* Order Requiring Limited Briefing 3 (Doc. 17), on July 1, 2026, Defendants filed their brief focused *solely* on the effect of *Barnes*, if any, on the excessive force claims. Defs.' Limited Briefing to Address Judge Lindsay's June 5 Mem. Op. and Order (Doc. 18). *Inexplicably, Defendants chose not to address the unlawful detention claims or the court's detailed concerns regarding their objections, as spelled out in Price I.* Under these circumstances, the court can only conclude that Defendants agree with the court's analysis in *Price I* concerning the insufficiency of their objections related to the unreasonableness of their prolonged detention of J.C. In addition, by failing to brief the matter, Defendants have waived or forfeited any objections they may have had to the court's additional reasons, as set forth in *Price I* and herein, to overrule their objections.

previously possessed the gun before his brother[5] was seen leaving the pool with it; and (2) they also had reasonable suspicion that he knew where the gun was located and, therefore, extended their investigation and J.C.'s detention to take him home to discover the location of the gun and/or his brother who had been seen with the gun:

> Defendants Britton and White had reasonable suspicion that J.C., a juvenile, had possessed a handgun at the neighborhood pool. They also had reasonable suspicion that J.C. knew the whereabouts of the gun since his "brother" had possibly left the pool with the gun.
>
> . . . .
>
> Defendants Britton and White had additional articulable, reasonable suspicion. They were intending to extend the investigation for the brief purpose of taking J.C. home to discover the whereabouts of the gun that J.C.'s "brother" had left the pool with. Doc. 6-1, at 7. Defendants Britton and White informed J.C. "he was being detained and request[ed] that he place his hands behind his back." Doc. 1, at ¶73. This is reasonably related to the scope of the circumstances which justified the interference in the first place.

Defs.' Obj. 4-5 (Doc. 11).

Defendants Britton and White, however, acknowledge that the first part of this argument directly conflicts with Plaintiff's allegation that "J.C. never had a gun." Defs.' Obj. 2. As correctly noted by the magistrate judge, the court must construe this allegation in Plaintiff's Complaint and other allegations, including the allegation—that "**J.C. informed [security guard Shana] Cowen he did not have a gun**, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go"—as true and in the light most favorable to Plaintiff. Report 11 (quoting Compl. ¶ 10) (emphasis added); *see also* Compl. ¶¶ 68-69 ("[D]espite having information that J.C. had not committed any crimes as he did not have a gun

[5] In the Complaint, Plaintiff explains that, although he used the term "brother" when responding to Defendants' questions, he used this term to mean that this was a "close friend." Compl. ¶ 42 & n.2. It is apparent from Plaintiff's pleadings, though, that Defendants took this to mean that the young man who left the scene was J.C.'s actual brother and an immediate family member. *See id.* ¶¶ 28-30, 61, 66, 68, 114.

and was not described by witnesses as being the person with a gun, Defendant Frias instructed Defendants Britton and White to detain J.C."). In addition, Defendants' objection cites to, and relies on, the incident report attached as an exhibit to their Motion to Dismiss. The court has already ruled that it will not consider the incident report as part of the pleadings in analyzing Defendants' Motion to Dismiss. *See supra* Sec. IV.A.

Thus, this leaves only Defendants' argument that J.C.'s continued detention was justified for purposes of their conducting an investigation regarding the brother's possession of a firearm, using J.C. as a witness to obtain information regarding the whereabouts of the brother and/or the gun. Even assuming that J.C.'s continued detention past the initial fourteen minutes was appropriate for this purpose, Defendants Britton and White offer no legal authority that would justify J.C.'s *continued Terry detention that involved transporting him (a minor) to another location*, whether to his home or anywhere else under the circumstances. Moreover, the court was unable to find any Fifth Circuit or Supreme Court authority that would warrant J.C.'s continued detention for this purpose—which the court can only describe as a "detain and tour"—*absent probable cause that he had committed a crime*.

By definition, *Terry* stops are brief. In *Dunaway v. New York*, the Supreme Court explained that, because of the limited nature of the intrusion, brief investigative *Terry* stops of less than a minute that involve, for example, random checks for drivers' licenses or briefly questioning a driver and passengers regarding suspicious circumstances, fall within *Terry*'s narrow intrusions that do not demand the probable cause required for an arrest, but "any further detention or search must be based on consent or probable cause." 442 U.S. 200, 211 (1979). Although the Supreme Court has not adopted a time limitation for a permissible *Terry* stop, courts have held that investigative detentions involving the transportation of a suspect to another location require more

than reasonable suspicion, that is, probable cause or consent. *See id.* at 207 (concluding that Dunaway was "seized" without probable cause and taken involuntarily to the police station for questioning regarding an informant's lead implicating him in a robbery/murder); *United States v. Place*, 462 U.S. 696, 709-10 (1983) (concluding that the detention of a suspect's luggage that was seized for ninety minutes and transported to another location for a dog sniff went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics); *United States v. Baker*, 203 F.3d 827, 1999 WL 1234383, at *3 (5th Cir. 1999) (concluding that, although the length of the detention was unclear, "the facts in the present case are clearer than the facts in *Place*, as both Baker and his luggage were detained for transport to another location where a dog sniff could be conducted."). Thus, Defendants' assertion that they had reasonable suspicion, without more, to extend their investigation and J.C.'s detention to take him home in an effort to discover the location of the gun and/or his brother is insufficient.

Defendants Britton and White cite cases in their Motion to Dismiss, arguing that much longer detentions of several hours have been upheld, but these cases are distinguishable for the reasons noted in Plaintiff's response (*see* Pl.'s Resp. 14-18), and two of the cases are from another circuit. For example, Defendants point to *Illinois v. McArthur*, 531 U.S. 326, 332 (2001), for the conclusion that a "two-hour detention while officers obtained a search warrant for a trailer [was found to be] reasonable [and upheld because] . . . the 'time period was no longer than reasonably necessary for the police, acting with due diligence, to obtain the warrant.'" Defs.' Mot. Dismiss 9-10. As Plaintiff correctly notes (*see* Pl.'s Resp. 15), the detention in this case was upheld because the officers had *probable cause* to believe that the suspect had illegal drugs in his home. *McArthur*, 531 U.S. at 331-32. It is, therefore, distinguishable and does not support Defendants' assertion that

reasonable suspicion justified their further detention of J.C. for the investigative purpose identified by them that involved transporting him (a minor) to another location.

In addition, to support their contention that reasonable suspicion justified what the court has called their decision to "detain and tour," Defendants Britton and White rely on *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). In that case, the Supreme Court considered the unique problems presented by the advent of alimentary canal smuggling. Customs officials at Los Angeles International Airport stopped and questioned respondent Rosa Montoya de Hernandez, who had arrived on a flight from Bogota, Colombia. The officials suspected that Montoya was an alimentary canal smuggler. When she declined to undergo an x-ray examination and could not be placed on a return flight to Colombia, Montoya was detained. After more than sixteen hours, the customs officials obtained a court order authorizing a rectal examination and an involuntary x-ray. The rectal examination resulted in the discovery of the first of 88 cocaine-filled balloons. The district court denied Montoya's motion to suppress the cocaine contained in the balloons, and Montoya was convicted of possession with intent to distribute and of unlawful importation of cocaine. The case was ultimately appealed to the Supreme Court.

Writing on behalf of the Court, former Chief Justice William Rehnquist stressed that, consistent with "Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the . . . border than in the interior." *Id.* at 538. Chief Justice Rehnquist also emphasized that individuals presenting themselves for entry into the United States have a lesser expectation of privacy at the border than in the interior. *Id.* at 539-40. Based on these considerations, the Court held, in pertinent part, "that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the

facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Id.* at 541-42.

Defendants Britton's and White's reliance on *Montoya de Hernandez* is puzzling, to say the least. The court takes judicial notice that the events alleged in the Complaint did not take place near the border, but in Kaufman County, Texas, which is hundreds of miles from the nearest points at the Mexico border. Otherwise stated, the Supreme Court's decision in *Montoya de Hernandez* provides no support for Defendants Britton's and White's contention that their acts amounting to a "detain and tour" after the initial fourteen-minute detention were based on reasonable suspicion.

In summary, the court agrees with the magistrate judge and concludes that Plaintiff has stated a plausible claim for unreasonable seizure because the well-pled facts indicate Defendant White and Defendant Britton (1) detained J.C. for longer that was necessary to confirm or dispel their suspicion that Plaintiff was or had been in possession of a gun at the pool; and (2) extended J.C.'s detention without additional reasonable suspicion to handcuff him and transport him to another location.

Accordingly, accepting the allegations in Plaintiff's Complaint as true and viewing the facts as pleaded in the light most favorable to Plaintiff, the court **overrules** Defendants' objections to the magistrate judge's recommendation that the court deny Defendants' Motion to Dismiss Plaintiff's unlawful detention claims.

### C. Plaintiff's Excessive Force Claims Against Defendants Sharrock and Frias

The magistrate recommended that the court deny Defendants' Motion to Dismiss with respect to Plaintiff's Fourth Amendment excessive force claims against Defendants Sharrock and Frias. Report 32-38. Defendants Sharrock and Frias objected to these adverse recommendations, and, therefore, in the following section, the court conducts a de novo review of Plaintiff's Fourth

Amendment excessive force claims against Defendants Sharrock and Frias. The parties do not dispute that the constitutional standard governing Plaintiff's claim that law enforcement officials used excessive force in the course of making an investigatory stop or other "seizure" of his person is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." *Graham*, 490 U.S. at 388.

At the motion-to-dismiss stage, Defendants Sharrock and Frias are entitled to qualified immunity unless Plaintiff has alleged facts sufficient to plausibly show that (1) Defendants' conduct violated a constitutional right and (2) the constitutional right was "clearly established" at the time of the alleged misconduct. *See Harlow*, 457 U.S. at 818; *Saucier*, 533 U.S. at 201. Defendants Sharrock and Frias have asserted this defense in Defendants' Motion to Dismiss.

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme Court initially set forth a mandatory two-part inquiry for determining whether a government official was entitled to qualified immunity. *Saucier*, 533 U.S. at 201. Based on the facts alleged in Plaintiff's Complaint, the magistrate judge concluded (1) that Plaintiff had stated a claim that Defendants Sharrock and Frias violated J.C.'s Fourth Amendment rights by using excessive force against him, and (2) that those rights were clearly established at the time. Report 32-38. Defendants Sharrock and Frias challenge both conclusions. Ultimately, for the reasons stated below, the court reaches the same conclusions as the magistrate judge—that Defendants' Motion to Dismiss Plaintiff's excessive force claims against Defendants Sharrock and Frias should be denied—but based on different reasoning.

The Fourth Amendment excessive-force questions here arise in the context of a lawsuit against Defendants under Section 1983, where the qualified immunity doctrine applies. As previously describes, qualified immunity shields officers from suit unless their actions violate

"clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The doctrine ensures that "fear of liability will not unduly inhibit officials in the discharge of their duties." *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (internal quotation marks and citation omitted).

As previously explained, once a defendant properly raises a qualified immunity defense, "the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021). To carry that burden, a plaintiff must show that (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the conduct was clearly established at the time. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021). Courts have the discretion to address either or both prongs. *Id.*

Here, Plaintiff asserts that Defendants Sharrock and Frias used excessive force against J.C., violating his Fourth Amendment rights. Both Defendants contend that these claims are precluded under either prong of qualified immunity. The court addresses both prongs.

***1. Constitutional Violation***

The first prong of the qualified immunity analysis asks whether an officer's use of force violated the Fourth Amendment. The "touchstone" of the Fourth Amendment is "reasonableness," as measured in objective terms. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). An officer violates the Fourth Amendment when an arrestee "suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020); *see also Graham*, 490 U.S. at 395-96. The question is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake.

*Graham*, 490 U.S. at 396. Courts must, therefore, "slosh [their] way through [a] factbound morass." *Scott*, 550 U.S. at 383.

For an excessive-force claim, courts consider the *Graham* factors: (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In evaluating the *Graham* factors, courts also consider the time officers had to make decisions, whether the force used is "measured and ascending' in accordance with the suspect's aggression, whether the suspect signaled that he was armed, and whether he moved toward or away from law enforcement. *See Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022); *Joseph*, 981 F.3d at 332.

Plaintiff alleges that six separate officer actions (two actions by Defendant Sharrock and four actions by Defendant Frias) violated J.C.'s Fourth Amendment rights: first when Defendant Sharrock tased him after Deputy Britton had already tackled him to the ground and was holding him to the ground; second, when Defendant Sharrock tased him a second time; third, when Defendant Frias tased him for the first time after Defendant Sharrock had already tased him twice; fourth, when Defendant Frias tased him a second time; fifth, when Defendant Frias drive stunned[6] him as he was on the ground after being tased a total of four times; and sixth, when Defendant Frias drive stunned him a second time. Because the court must "assess the reasonableness of each defendant's actions separately," *Pratt v. Harris Cnty.*, 822 F.4d 174, 181 (5th Cir. 2016), it will evaluate each Defendant's alleged actions in turn.

[6] "Drive-stunning" refers to the act of pressing a taser directly against a person's body without the taser's cartridge containing the metal probes. *See Carroll v. Ellington*, 800 F.3d 154, 164 (5th Cir. 2015). This method of tasing "inflicts a painful electric shock on contact[] but does not cause the same seizing" or immobilizing effect as deploying a taser with prongs. *Cloud v. Stone*, 993 F.3d 379, 382 n.2 (5th Cir. 2021).

***a. Defendant Sharrock***

i. <u>The first tasing</u>

To evaluate Plaintiff's excessive-force claim against Defendant Sharrock, the court must examine "the facts and circumstances confronting" him when he deployed his taser, *Graham*, 490 U.S. at 397, as well as the "totality of the circumstances," *Garner*, 471 U.S. at 8-9. The court's inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Those facts and circumstances include the following.

On June 6, 2022, Defendants Sharrock and Britton arrived at a pool where Defendant White and Deputy Snow had already responded to a call from pool security guard Cowen regarding a young, black male with a gun at the pool, and these deputies were in the process of questioning J.C. Compl. ¶¶ 31-32. Previously, "J.C. informed [security guard Shana] Cowen he did not have a gun, showed Cowen his belongings, and after checking them and confirming he did not have a gun Cowen told him he was good to go." *Id.* ¶ 10. After further questioning and a witness informing Defendants that another individual with the gun had jumped a fence and left the pool, Defendant Frias told Defendants Britton and White "to take J.C. home, check the brother out, and 'He's with you. Cuffs or no cuffs I don't care but he's with you till we find the gun.'" *Id.* ¶ 66. J.C. again informed the deputies that there was no gun. *Id.* ¶ 67. "[D]espite having information that J.C. had not committed any crimes as he did not have a gun and was not described by witnesses as being the person with a gun, Defendant Frias instructed Defendants Britton and White to detain J.C." *Id.* ¶ 69; *see also id.* ¶ 68 (providing screenshot of a portion of the Incident Report where Defendant Frias states that Defendant White "advised me that a witness advised her that the subject has a

brother who retrieved the gun and jumped the back fence area and location prior to our arrival"; that "[d]ue to the information that was gathered and the subject that was being questioned was 16 years of age I directed [Defendants] White and Britton to take custody of the subject being questioned"; and that "we would be taking home to locate his brother and release the subject to his parents after informing the parent of the nature of the call.")

Defendants Britton and White "further detained J.C. by informing him he was detained and requesting that he place his hands behind his back." *Id.* ¶ 71. "J.C. spoke calmly with the deputies for approximately fourteen minutes answering all of their questions before he was instructed to place his hands behind his back." *Id.* ¶ 72. Defendant Britton informed J.C. that "they were going to take him to his house to find out where he was staying." *Id.* ¶ 73. Defendants Britton and White "further detained J.C. by informing him he was detained and requesting that he place his hands behind his back." *Id.* ¶ 74.

J.C., upon being "requested" to place his hands behind his back and that he was being detained, said "'holdup' in response and turned and took two steps in the direction of his younger sister who was sitting watching the encounter to tell her that he was being detained and that the deputies would be taking him home." *Id.* ¶ 75. Almost simultaneously, Defendant Britton grabbed him and tackled him on the concrete ground. *Id.* ¶ 76. After tackling him, Defendant Britton held J.C. down on the ground. *Id.* ¶77.

Only two seconds later, Defendant Sharrock tased J.C. not once but twice. *Id.* ¶ 78. "J.C. was not threatening any officer or other person immediately prior to when Defendant Sharrock tased him twice as J.C. never raised his voice nor made any verbal threats toward Defendant Sharrock or any other person." *Id.* ¶ 79. "J.C. was not actively resisting arrest prior to when Defendant Sharrock tased him twice as J.C. was on the ground with hands and legs clearly visible

as Defendant Britton [was] holding him down on the ground." *Id.* ¶ 80. Further, "J.C. was not attempting to flee, as he did not make any motions indicating an attempt to escape at the time Defendant Sharrock tased him twice as J.C. was on the ground with hands clearly visible while Defendant Britton held him down on the ground." *Id.* ¶ 82.

Examining the totality of the circumstances, the court concludes that Defendant Sharrock's use of force, namely his first deployment of the taser, was objectively unreasonable. On balance, the *Graham* factors support this conclusion.

The first factor is the severity of the suspected crime. Defendant Sharrock arrived on the scene while other deputies were already questioning J.C. Before Deputy Britton tackled J.C., Defendant Sharrock was already equipped with the knowledge that J.C. was unarmed, and that another individual who had the gun had jumped the fence and left the pool. Based on these allegations, this factor, on balance, weighs against Defendant Sharrock.

The second factor is whether the suspect posed an immediate threat to the safety of the officer and others. J.C. was already restrained, having been tackled and held to the ground by Defendant Britton, made no threatening comments, and was unarmed and compliant. He did not ignore any prior warnings. Before deploying his taser the first time, Defendant Sharrock did not attempt to de-escalate the situation with J.C. Defendant Sharrock would have no reason to believe that, at time he tased J.C., J.C. "pose[d] a threat of serious harm to the officer[s] or to others." *Manis*, 585 F.3d at 843. This factor weighs against Defendant Sharrock's use of force.

The third factor also weighs against Defendant Sharrock's use of force—whether the suspect was actively resisting arrest or attempting to evade arrest by flight. As the Fifth Circuit has explained, "[o]f the *Graham* factors, the extent of [the suspect's] resistance is the most important to analyzing [an officers'] use of his taser." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022).

When faced with an uncooperative individual, officers must use "measured and ascending actions that correspond to [the individual's] escalating verbal and physical resistance." *Joseph*, 981 F.3d at 332-33. Indeed, "the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017). Also relevant is an individual's level of resistance, as the Fifth Circuit has "found tasing not excessive where a suspect 'resists arrest or fails to follow police orders' or 'resist[s]' an officer's attempt to handcuff him." *Betts*, 22 F.4th at 583 (alteration in original) (citation omitted); *see also Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) (per curiam) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him.").

When an individual offers merely "passive resistance or no resistance at all," an officer's use of a taser may be excessive. *See, e.g., Cloud*, 993 F.3d at 385. The Fifth Circuit has found that an officer's taser use was excessive when a suspect "had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" *Id.* (quoting *Newman v. Guedry*, 703 F.3d 757, 762-63 (5th Cir. 2012)). Likewise, an officer's taser use was found excessive when a suspect's "resistance" is merely pulling an arm away from the arresting officer. *Ramirez*, 716 F.3d at 378. Further, an officer cannot tase someone who is "facedown in the fetal position, not suspected of committing any crime, not posing a threat to officers or others, and not actively resisting arrest." *Joseph*, 981 F.3d at 342.

Under this framework, Defendant Sharrock's decision to deploy his taser falls outside the Fifth Circuit's bounds of reasonableness. At the point he deployed the taser, force had already been used against J.C. when Defendant Britton tackled and held him to the ground. J.C. was not resisting, was unarmed, and not attempting to flee. Here, no allegations support that Defendant

Sharrock used "measured and ascending" actions in response to J.C., who had already been tackled and was held on the ground by Defendant Britton. This factor weighs against Defendant Sharrock's use of force.

In summary, faced with an unarmed individual who had already been tackled and held to the ground by Defendant Britton, who made no threatening comments, and was not resisting or attempting to flee, it was objectively unreasonable for Defendant Sharrock to deploy his taser. Accordingly, Plaintiff has pleaded sufficient facts to defeat Defendant Sharrock's assertion of qualified immunity on this claim.

ii. The second tasing

When Defendant Sharrock deployed his taser a second time, J.C. was still pinned to the ground with Defendant Britton on top of him, unarmed, not resisting, and not attempting to flee. He had already been tased once by Defendant Sharrock. None of the *Graham* factors supports Defendant Sharrock's second use of the taser. As to the first factor, the severity of the suspected crime, Defendant Sharrock arrived on the scene while other deputies were already questioning J.C. Before Deputy Britton tackled J.C., Defendant Sharrock was already equipped with the knowledge that J.C. was unarmed, and that another individual who had the gun had jumped the fence and left the pool. Based on these allegations, this factor, on balance, weighs against Defendant Sharrock.

The second factor, whether the suspect posed an immediate threat to the safety of the officer and others, also weighs against Defendant Sharrock. If there was any doubt that J.C. presented an immediate threat to the officers, the public, or himself, it was dispelled when Defendant Britton tackled him and held him to the ground, and, most certainly, after Defendant Sharrock first deployed his taser. The third *Graham* factor provides no support for Defendant Sharrock's second use of his taser—whether the suspect was actively resisting arrest or attempting to evade arrest by

flight. After being tackled to the ground by Defendant Britton, J.C. did not ignore any police commands, did not resist, and made no attempt to flee.

In sum, under the *Graham* factors and the totality of the circumstances, the court concludes that Plaintiff has pleaded sufficient facts to defeat Defendant Sharrock's assertion of qualified immunity on this claim.

***b. Defendant Frias***

As with Defendant Sharrock, the court must review "the facts and circumstances confronting" Defendant Frias when he deployed his taser twice and drive stunned J.C. twice, *Graham*, 490 U.S. at 397, as well as the "totality of the circumstances," *Garner*, 471 U.S. at 8-9. Because the facts leading up to the first and second tasing by Defendant Sharrock are discussed in detail in the immediately preceding section, the court recaps the events just after Defendant Sharrock deployed his taser for the second time.

Defendant Frias deployed his taser for the first time two seconds after Defendant Sharrock had deployed his taser for the second time. Defendant Frias deployed his taser for the second time just after he deployed his taser the first time. He subsequently drive stunned J.C. twice.

Here, none of the three *Graham* factors supports the reasonableness of Defendant Frias's actions of tasing J.C. twice and drive stunning him twice. Further, considering the totality of circumstances preceding tasing and drive stunning, the court concludes that Plaintiff has pleaded sufficient facts to defeat Defendant Frias's assertion of qualified immunity on this claim.

As the court has determined that Plaintiff has plausibly alleged that Defendants Sharrock's and Frias's respective uses of force were excessive, the court must now address the second prong of the qualified immunity analysis and ask whether Defendants Sharrock's and Frias's alleged actions violated clearly established law.

### *2. Clearly Established Law*

The second prong of the qualified immunity analysis asks whether an officer's actions violated clearly established law. *Betts*, 22 F.4th at 584. This requirement "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Saucier*, 533 U.S. at 206 (explaining that qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force" (citation modified)).

"The clearly established inquiry is demanding, especially in claims for excessive force." *Harmon*, 16 F.4th at 1167. Such claims often involve officers making "split-second decisions," and the "results depend 'very much on the facts of each case.'" *Id.* at 1166 (quoting *Kisela*, 584 U.S. at 104). To be clearly established, the contours of the right must be "sufficiently definite [so] that any reasonable official in the [officer's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley*, 475 U.S. at 341).

To overcome Defendant Sharrock's qualified immunity in this case as to the first deployment of his taser, Plaintiff must show that clearly established law prohibited Defendant Sharrock from using the taser against an unarmed individual, who had already been tackled to the ground, was not resisting or attempting to flee, made no threatening comments, and was given no prior warning that he would be tased. As to Defendant Sharrock's second deployment of his taser, Plaintiff faces a similar burden.

Here, the court agrees with Plaintiff that, pursuant to clearly established law, Defendant Sharrock's deployment of his taser the first and second time was, in each instance, an objectively unreasonable use of force. Specifically, in cases involving the use of tasers, Fifth Circuit cases decided prior to June 2022 should have made clear to Defendant Sharrock that deploying his taser twice in succession constituted excessive force, as J.C. had already been tackled by Defendant Britton, was being held down, was unarmed, offered no resistance, and was not attempting to flee.

In *Newman v. Guedry*, decided in 2012, the Fifth Circuit "held that officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" *Cloud*, 993 F.3d at 384-85 (quoting *Newman*, 703 F.3d at 762-63). Under those circumstances, police could not "immediately resort [] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763. In another case decided in 2013, the Fifth Circuit determined the use of force was excessive when an officer tased an individual who did no more than pull his arm out of the officer's grasp, and who was not even suspected of a crime up to that point. *Ramirez*, 716 F.3d at 378.

Likewise, in another case decided in November 2020, the Fifth Circuit held that the use of force was excessive when officers tased and beat a man who "was not suspected of committing any crime, was in the fetal position, and was not actively resisting." *Joseph*, 981 F.3d at 336; *see also id.* at 335 ("If Joseph was not actively resisting, [officers] inflicted force beyond what the Fourth Amendment permits.").

Notably, the use of a taser that the Fifth Circuit found to be reasonable in *Betts* stands in contrast to the pleadings here:

> Other factors show Brennan's use of force was reasonable. For instance, he did not tase as a first resort. That is, he did not "immediately resort[ ] to [the taser] . . .

> without attempting to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763; *see also Trammell*, 868 F.3d at 342 ("This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need."). To the contrary, Brennan "properly use[d] 'measured and ascending actions that correspond[ed] to [Betts's] escalating verbal and physical resistance.'" *Cloud*, 993 F.3d at 384 (quoting *Joseph*, 981 F.3d at 332-33). Brennan tried to get Betts to stand behind the truck by invitation, explanation, command, and even by grasping his arm. And Brennan warned Betts more than once that he would be tased if he did not comply with his orders. Only when all those lesser options appeared to have failed did Brennan use his taser.
>
> Furthermore, Brennan tased Betts only once. That was enough to subdue Betts and allow Brennan to handcuff him. At that point, additional force was not necessary and Brennan did not use any (although he did warn Betts that further resistance would be met with another tase). This shows a reasonable "relationship between the need [for force] and the amount of force used." *Joseph*, 981 F.3d at 332 (citation omitted); *see also Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (citation omitted)); *cf. Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) (per curiam) (finding excessive force where officer "continued to tase [arrestee] repeatedly, even after she was subdued on the ground").

*Betts*, 22 F.4th at 583-84; *see also Salazar v. Molina*, 37 F.4th 278, 284 (5th Cir. 2022) ("When Molina made the split-second decision to deploy his taser, Salazar had just committed a dangerous felony and was unrestrained at night in the open. Because of the preceding high-speed chase, Molina could reasonably be concerned about the sincerity of Salazar's purported surrender. And the totality of the force deployed – a 10-second tasing – was comparatively modest and not grossly disproportionate to the threat Molina could have reasonably perceived.").

Considering the allegations of the Complaint, set out above, and these established standards, the undersigned finds that Plaintiff has pleaded sufficient facts to allege that clearly established law gave Defendant Sharrock fair warning that by tasing J.C. twice in rapid succession almost immediately after he was tackled to the ground and held there by Defendant Britton, with his hands visible, when he was neither threatening Defendants, himself, nor the public, nor

attempting to flee, constituted excessive force sufficient to defeat Defendant Sharrock's qualified immunity defense on this claim.

Similarly, considering the allegations of the Complaint, set out above, and these established standards, the undersigned finds that Plaintiff has pleaded sufficient facts to allege that clearly established law gave Defendant Frias fair warning that by tasing J.C. twice in rapid succession after he had already been tased twice by Defendant Sharrock, and while he was still being held to the ground by Defendant Britton, with his hands visible, when he was neither threatening Defendants, himself, nor the public, nor attempting to flee, constituted excessive force sufficient to defeat Defendant Frias's qualified immunity defense on this claim.

The court is well-aware that Defendants Sharrock and Frias dispute the events that led to each of them deploying their tasers twice and, in the case of Defendant Frias, drive stunning J.C. after deploying his taser twice. Those events, however, present a question of fact that is reserved for summary judgment. *See generally McLendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002) ("[T]he legally relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss. At the earlier stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.' On summary judgment, however, the plaintiff can no longer rest on the pleadings . . . and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity] inquiry.") (internal quotation marks and citations omitted) (original emphasis); *see also May*, 398 F. Supp. 3d at 76 ("If allegations are well-pleaded, it is not for the court to determine whether they ultimately prove to be true. That is grist for another day.").

**D. Plaintiff's Punitive Damages Claim**

In their Motion to Dismiss, Defendants seek dismissal of Plaintiff's claim for punitive damages, contending that Plaintiff's allegations were "conclusory." Defs.' Mot. Dismiss 24. The magistrate judge did not address this portion of Defendants' Motion to Dismiss. Defendants, however, did not object to the magistrate judge's Report in this regard.

A plaintiff may recover punitive damages under § 1983 against a defendant in his individual capacity if the defendant's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). At the motion-to-dismiss stage, and given Plaintiff's allegations of malice, the court **denies without prejudice** Defendants' Motion to Dismiss Plaintiff's claim for punitive damages. Defendants may reurge this matter at the summary judgment-stage.

**V. Conclusion**

Based on the foregoing, the court **overrules** Defendants' Objections to the Report (Doc. 11), **overrules** Defendants' Objections to the Supplemental Report (Doc. 24), and **accepts** the magistrate judge's findings and conclusions, ***as herein modified***. Specifically, with respect to Plaintiff's Fourth Amendment unlawful detention claims against Defendants White and Britton, the court **accepts** the magistrate judge's recommendation, as supplemented by the undersigned's additional analysis. With respect to Plaintiff's Fourth Amendment excessive force claims against Defendants Sharrock and Frias, the court **accepts** the magistrate judge's ultimate recommendation but based on different reasoning.

Accordingly, the court **denies** Defendants' Motion to Dismiss (Doc. 6). At this early, motion-to-dismiss stage, Plaintiff has alleged sufficient plausible facts to overcome Defendants'

entitlement to qualified immunity with respect to the Fourth Amendment unlawful detention claims against Defendants White and Britton and Fourth Amendment excessive force claims against Defendants Sharrock and Frias. In other words, in light of the authority cited by the court—which was clearly established at the time of the incident made the basis of this lawsuit—a reasonable law enforcement officer would have known that the course of conduct as pleaded by Plaintiff violated the United States Constitution. The court expresses no view, however, as to whether Defendants may be entitled to qualified immunity at the summary judgment-stage, or as to the ultimate merits of Plaintiff's Fourth Amendment claims.

**It is so ordered** this 30th day of September, 2026.

Sam A. Lindsay
United States District Judge